IN THE MATTER OF LENNOX S. HINDS, AN ATTORNEY
AT LAW.

Argued February 9, 1982—Decided August 4, 1982.

*Morton Stavis* argued the cause for respondent Lennox S. Hinds (*Morton Stavis, Bernard K. Freamon* and *Alfred A. Slocum,* attorneys; *Lewis Myers, Jr.,* a member of the Mississippi and Illinois Bars, of counsel; *Morton Stavis, Bernard K. Freamon* and *Neil M. Mullin,* on the brief).

*Colette A. Coolbaugh,* Assistant Director, Ethics & Professional Services, argued the cause for complainant District VIII Ethics Committee (*Colette A. Coolbaugh,* attorney; *Harold L. Rubenstein,* on the brief).

*Stephen M. Latimer* submitted a brief on behalf of *amicus curiae* Public Interest Lawyers of New Jersey (*Stephen M. Latimer*, attorney; *George Conk* and *Patricia Thornton*, on the brief).

*Elizabeth M. Schneider* and *Frank Askin* submitted a brief on behalf of *amici curiae* The American Civil Liberties Union of New Jersey and The Association of Black Women Lawyers of New Jersey.

The opinion of the Court was delivered by

HANDLER, J.

This case requires us to determine the constitutional scope of rules disciplining an attorney for making out-of-court statements publicly criticizing the trial judge's conduct of an ongoing criminal trial. Lennox Hinds, the appellant, claims that as a matter of constitutional right under the First Amendment, an attorney cannot be disciplined for making such statements unless they present a "clear and present danger" to the fairness of the judicial proceeding. The primary disciplinary standard sought to be applied in this case, however, requires discipline of an attorney if his extrajudicial statements are "reasonably likely" to interfere with a criminal trial. *DR* 7–107(D).

We now affirm the constitutionality of the "reasonable likelihood" standard of *DR* 7–107(D) for restricting attorney extrajudicial speech in the specific setting of a criminal trial. We further hold that the determination of whether a particular statement is likely to interfere with a fair trial involves a careful balancing of factors, including consideration of the status of the attorney, the nature and timing of the statement, as well as the context in which it was uttered. In addition, we hold that *DR* 7–107(D) applies not only to an attorney of record in a criminal case but also to an attorney who cooperates with the defense on a regular and continuing basis, provides legal assistance in connection with the defense of a criminal charge, and holds himself out to be a member of the defense team.

However, because this opinion represents the first time that we have interpreted the proper scope of *DR* 7–107(D) and the standard to be followed in applying this disciplinary rule to extrajudicial statements, we deem it appropriate to give our determination prospective effect only. Consequently, we dismiss these charges against Hinds, as well as related charges under *DR* 1–102(A)(5), which sanctions attorney conduct that is "prejudicial to the administration of justice."

I

We deal first with the procedural and factual background of the case. Hinds has been a member of the New Jersey Bar since 1973. He has been active and prominent as a lawyer in civil rights causes and has a national reputation for his work as Director of the National Conference of Black Lawyers (hereinafter "NCBL"), a capacity in which he served for five years until 1978. In 1973 Joanne Chesimard, a black woman reputed to be a militant radical, was accused of killing a New Jersey State trooper. Following her arrest, Chesimard was brought to trial after a long series of delays. Hinds represented Chesimard during this pretrial period in several federal civil actions concerning the legality and general conditions of her incarceration by the State. Hinds apparently did not, however, represent Chesimard at her criminal trial.

Chesimard finally went on trial for murder in 1977 in the Superior Court, Law Division, in New Brunswick. After observing the initial phases of the trial and while the jury was still being impaneled, Hinds called a press conference at his New Brunswick office on January 20, 1977. In an article appearing January 21, 1977, in the *New York Daily News* under the headline, "Joanne Loses 2 Rounds in Trial Transfer," it was reported that:

> ... Lenox [sic] Hinds, an attorney also representing Mrs. Chesimard, said the defense team wanted the case moved to another court because in New Brunswick "what we are seeing is legalized lynching."

He said he was speaking for the defense team because its members were "gagged" by [the trial judge] whom he accused of asking prospective jurors self-serving questions which he said were leading to "the creation of a hangman's court."

An article appearing in the *Newark Star-Ledger* on the same date reported that Hinds had referred to the Chesimard trial as "a travesty." The article further quoted Hinds as saying that the trial judge "does not have the judicial temperament or the racial sensitivity to sit as an impartial judge" in Chesimard's trial, and that "[i]t was only after the trial began that we began to have fears that what we are seeing is a legalized lynching."

Also, a television reporter covering the press conference for the New Jersey Public Broadcasting Authority (Channel 52) recorded the following exchange:

Hinds: "We feel that it is a kangaroo—it will be a kangaroo court unless the judge recluses [sic] himself and that will be the very minimum.

Reporter: "And a kangaroo court means a guilty verdict?"

Hinds: "That's correct."

The Middlesex County Ethics Committee (now the District VIII Ethics Committee) authorized an investigation to determine whether Hinds' statements constituted a violation of any disciplinary rules. The investigation was stayed until completion of Chesimard's trial. Chesimard was eventually convicted of murder in the first degree and sentenced to a mandatory term of life imprisonment. Thereafter, the disciplinary proceedings were renewed, and as a result of the investigation, it was recommended that Hinds be charged with violating two disciplinary rules: *DR* 1–102(A)(5), which prohibits attorneys from "[e]ngag[ing] in conduct . . . prejudicial to the administration of justice;" and *DR* 7–107(D), which provides that

[d]uring the selection of a jury or a trial of a criminal matter, a lawyer cr law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extra-judicial statement that he expects to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial . . . .

In December 1977 the Ethics Committee adopted this recommendation and approved the filing of charges against Hinds for

violating these disciplinary rules. On January 3, 1978, Hinds was served with the charges and informed that a hearing would be held. Instead of responding, however, Hinds filed a suit in federal court on February 10, 1978, seeking to enjoin the State disciplinary proceedings and to obtain a judgment declaring these particular disciplinary rules unconstitutional. The State proceedings were then stayed during the early stages of the federal litigation.

The United States District Court eventually denied the injunction and dismissed the complaint on grounds of abstention. *Garden State Bar Ass'n v. Middlesex Cty. Ethics Com.,* No. 78–273 (D.C.N.J. June 6, 1978 and Dec. 13, 1979). On appeal, the Third Circuit reversed, finding the abstention doctrine inapplicable because it felt the State procedure effectively denied Hinds the right to present his constitutional claims in a timely manner before a competent State tribunal. *Garden State Bar Ass'n v. Middlesex Cty. Ethics Com.,* 643 *F.*2d 119, rehearing den., 651 *F.* 2d 154 (3 Cir. 1981) (en banc).

This Court, on its own motion, then ordered certification of the complaint against Hinds, pursuant to *R.* 2:12–1, and directed that "the entire record, including but not limited to, the constitutional challenges to *DR* 1–102 and *DR* 7–197(D) raised by respondent, be considered by this Court." We also granted leave for the American Civil Liberties Union of New Jersey and the Association of Black Women Lawyers of New Jersey to participate in the case as *amici curiae.* In the meantime, the United States Supreme Court granted *certiorari* in the federal case. In a decision dated June 21, 1982, the Supreme Court reversed the Circuit Court, unanimously holding that the federal courts should abstain from interfering with this State's ongoing disciplinary proceedings. *Middlesex Ethics Comm. v. Garden St. Bar Ass'n,* —— *U.S.* ——, 102 *S.Ct.* 2515, 73 *L.Ed.*2d 116. The Court reasoned that New Jersey's attorney disciplinary proceedings are considered "judicial in nature," *id.* at ——, 102 *S.Ct.* at 2522, the State has an "extremely important interest" in regulating the professional conduct of attorneys, *id.,* and the State's

system afforded Hinds "abundant opportunity" to raise his federal constitutional claims, *id.* at ——, 102 *S.Ct.* at 2523.[1]

## II

Disciplinary Rule 7–107(D) restricts the speech of attorneys who are associated with pending criminal litigation by sanctioning such attorneys for making any extrajudicial statement that they expect to be disseminated to the public and that is "reasonably likely" to interfere with a fair trial.[2]

Appellant Hinds claims that *DR* 7–107(D) is unconstitutionally vague and overbroad under the First Amendment. He asserts that the rule can be applied to restrict speech only when an attorney's out-of-court statements create a "clear and present danger" to the trial and that, applying this constitutional standard to these facts, his remarks regarding the conduct of the judge at the Chesimard trial did not violate the disciplinary rule or otherwise warrant sanction.

We note at the outset that the freedom to engage in robust public debate is at the very heart of the First Amendment. See *Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 200–201 (1982); *Kotlikoff v. Community News*, 89 *N.J.* 62, 73 (1982). The Constitution unquestionably guarantees the right of citizens to criticize public officials, including judges. See *Brown v. United States*, 356 *U.S.* 148, 153, 78 *S.Ct.* 622, 625, 2 *L.Ed.*2d 589, 596 (1958); *Craig v. Harney*, 331 *U.S.* 367, 376, 67 *S.Ct.* 1249, 1255, 91 *L.Ed.* 1546, 1552 (1946). In our constitutional democracy, expressional activity enjoys the fullest and firmest

---

[1] As the Supreme Court observed in *Middlesex Ethics Comm. v. Garden St. Bar Assn.*, —— *U.S.* —— at ——, 102 *S.Ct.* 2515 at 2521, 73 *L.Ed.*2d 116 (1982), we recently amended our court rules to allow a party charged in a disciplinary proceeding to move before this Court for interlocutory review of a constitutional challenge to a disciplinary rule. See *R.* 1:20–4(d)(i).

[2] *DR* 7–107 also applies to other aspects of criminal trials, see *DR* 7–107(A) through (E), as well as disciplinary and juvenile proceedings, *DR* 7–107(F), civil actions, *DR* 7–107(G), and administrative hearings, *DR* 7–107(H).

protection. See *Brandenburg v. Ohio,* 395 *U.S.* 444, 89 *S.Ct.* 1827, 23 *L.Ed.*2d 430 (1969); *Bridges v. California,* 314 *U.S.* 252, 62 *S.Ct.* 190, 86 *L.Ed.* 192 (1941).

▉ A restriction on free speech can survive judicial scrutiny under the First Amendment only if certain fundamental and stringent conditions are satisfied. First, the limitation must "further an important or substantial governmental interest unrelated to the suppression of expression." *Procunier v. Martinez,* 416 *U.S.* 396, 413, 94 *S.Ct.* 1800, 1811, 40 *L.Ed.*2d 224, 240 (1974). Second, the restriction must be "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* These two conditions are interrelated in the sense that the restriction must not only further a substantial governmental interest unrelated to the suppression of speech but it must also go no further than is necessary and essential to protect that substantial governmental interest. The judicial inquiry into whether these conditions have been met involves a balancing process. The court must weigh the gravity and probability of the harm caused by freely allowing the expression against the extent to which free speech rights would be inhibited or circumscribed by suppressing the expression. See *Nebraska Press Association v. Stuart,* 427 *U.S.* 539, 562, 96 *S.Ct.* 2791, 2804, 49 *L.Ed.*2d 683, 699 (1976), citing *United States v. Dennis,* 183 *F.*2d 201, 212 (2 Cir. 1950) (Hand, J.), aff'd, 341 *U.S.* 494, 71 *S.Ct.* 857, 95 *L.Ed.* 1137 (1951).

▉ Like other citizens, attorneys are entitled to the full protection of the First Amendment, even as participants in the administration of justice. See *R.M.J.,* —— *U.S.* ——, ——, 102 *S.Ct.* 929, 935–38, 71 *L.Ed.*2d 64, 70–75 (1982); *Konigsberg v. State Bar,* 353 *U.S.* 252, 273, 77 *S.Ct.* 722, 733, 1 *L.Ed.*2d 810, 825 (1957). *Cf. Richmond Newspapers, Inc. v. Virginia,* 448 *U.S.* 555, 100 *S.Ct.* 2814, 65 *L.Ed.*2d 973 (1980) (reaffirming right of public access to trials). Since *DR* 7–107 purports to restrict the free speech rights of attorneys, its validity turns upon the application of conventional First Amendment standards. Under these de-

manding tests, we must first examine the nature and importance of the governmental interest assertedly advanced by the restriction.

There can be no doubt that the State has a substantial interest in ensuring the fairness of judicial proceedings. See *State v. Kavanaugh*, 52 *N.J.* 7, cert. den., 393 *U.S.* 924, 89 *S.Ct.* 254, 21 *L.Ed.2d* 259 (1968); *State v. Van Duyne*, 43 *N.J.* 369 (1964), cert. den., 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.2d* 279 (1965); *Sheppard v. Maxwell*, 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.2d* 600 (1966); *Singer v. United States*, 380 *U.S.* 24, 36, 85 *S.Ct.* 783, 790, 13 *L.Ed.2d* 630, 638, 646–47; *In re Sawyer*, 360 *U.S.* 622, 666, 79 *S.Ct.* 1376, 1397, 3 *L.Ed.2d* 1473, 1499 (1959) (Frankfurter, J., dissenting); *Hirschkop v. Snead*, 594 *F.2d* 356, 366 (4 Cir. 1979) (en banc); *Chicago Council of Lawyers v. Bauer*, 522 *F.2d* 242 (7 Cir. 1975), cert. den., *sub nom. Chicago Council of Lawyers v. Cunningham*, 427 *U.S.* 912, 96 *S.Ct.* 3201, 49 *L.Ed.2d* 1204 (1976); *United States v. Tijerina*, 412 *F.2d* 661, 667 (10 Cir. 1969). This interest does not belong to the defendant alone. The public also has an interest in a fair trial that cannot be imperiled or diminished by out-of-court assertions by either defense or prosecution lawyers. See *Kavanaugh*, 52 *N.J.* at 19–20; *Van Duyne*, 43 *N.J.* at 389; *State v. Carter*, 143 *N.J.Super.* 405, 408 (App.Div.), rev'd on other grounds, 71 *N.J.* 348 (1976). Thus, courts have recognized that restricting the extra-judicial statements of criminal defense attorneys relates to the government's substantial interest in preserving the proper administration of justice and the basic integrity of the judicial process. See *Singer*, 380 *U.S.* at 36, 85 *S.Ct.* at 790, 13 *L.Ed.2d* at 638.

Attorneys occupy a special status and perform an essential function in the administration of justice. Because attorneys are "officers of the court" with a special responsibility to protect the administration of justice, courts have recognized the need for the imposition of some reasonable speech restrictions upon attorneys. "The interest of the states in regulating lawyers is especially great since lawyers are essential to the primary gov-

ernmental function of administering justice, and have historical-
ly been 'officers of the courts.'" *Goldfarb v. Virginia State
Bar*, 421 *U.S.* 773, 792, 95 *S.Ct.* 2004, 2016, 44 *L.Ed.2d* 572, 588
(1975). *Cf. Standards Relating to Fair Trial and Free Press,
ABA Project on Minimum Standards for Criminal Justice* at 82
(1968) (hereinafter "ABA Project") (lawyers have a "fiduciary
obligation to the courts"). Thus, in resolving Hinds' federal
action, the Supreme Court recently noted that "[t]he State of
New Jersey has an extremely important interest in maintaining
and assuring the professional conduct of the attorneys it licens-
es." *Middlesex Ethics Comm.*, —— *U.S.* at ——, 102 *S.Ct.* at
2522.

In their unique and special capacity as judicial officers, law-
yers differ from ordinary citizens. This was aptly expressed by
Justice Frankfurter in his dissent in *In re Sawyer*:

> Of course, a lawyer is a person and he too has a constitutional freedom of
> utterance and may exercise it to castigate courts and their administration of
> justice. But a lawyer actively participating in a trial, particularly an emotional-
> ly charged criminal prosecution, is not merely a person and not even merely a
> lawyer .... He is an intimate and trusted and essential part of the machinery
> of justice, an "officer of the court" in the most compelling sense. [360 *U.S.* at
> 666, 79 *S.Ct.* at 1397, 3 *L.Ed.2d* at 1499–1500].

Justice Stewart, concurring in that case, agreed that an attorney
who uses a public forum to obstruct justice and interfere with a
fair trial cannot invoke the protection of the First Amendment
to avoid disciplinary sanctions. 360 *U.S.* at 646, 79 *S.Ct.* at 1388,
3 *L.Ed.2d* at 1489.

This interest in trial fairness is particularly acute in the
criminal context. There, the problem of preserving the basic
fairness and integrity of the proceeding is of constitutional
dimension because the defendant's right to a fair trial is guaran-
teed in the Sixth Amendment of the federal Constitution. Some
courts, including the Supreme Court, have even held that the
criminal defendant's constitutional right to a fair trial must take
precedence over free speech. See, *e.g., Estes v. Texas*, 381 *U.S.*
532, 540, 85 *S.Ct.* 1628, 1632, 14 *L.Ed.2d* 543, 549 (1965) (defend-
ant's right to a fair trial is "the most fundamental of all

freedoms"); *Bauer*, 522 *F.2d* at 248; *Tijerina*, 412 *F.2d* at 667; *Hirschkop v. Virginia State Bar*, 421 *F.Supp.* 1137, 1146–47 (E.D.Va.1976). *Cf. Gannett Co., Inc. v. DePasquale*, 443 *U.S.* 368, 99 *S.Ct.* 2898, 61 *L.Ed.2d* 608 (1979) (press may sometimes be excluded from pretrial hearings in a criminal case); *Branzburg v. Hayes*, 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.2d* 626 (1972) (journalists have no absolute First Amendment right to refuse to disclose their sources or other confidential information when asked to do so by a grand jury). More than in any other context, the criminal trial setting requires our most diligent effort to ensure that the truth emerges and that the right result is reached. See *In re Farber*, 78 *N.J.* 259 (1978). A criminal case involves the highest of stakes because the defendant stands to lose his most precious of freedoms—his personal liberty—if convicted. The fairness of the trial is integral to reaching a just and proper result. Therefore, there are compelling reasons for making every effort to preserve trial fairness in the criminal context. See *Middlesex Ethics Comm.*, —— *U.S.* at ——, 102 *S.Ct.* at 2522.

*DR* 7–107(D) clearly seeks to effectuate this important and substantial governmental interest in trial fairness. The difficult question is whether this disciplinary rule is broader than necessary or essential to protect that governmental interest.

■ Hinds contends *DR* 7–107(D) exceeds constitutionally permissible limits on grounds of both vagueness and overbreadth. While these doctrines are somewhat similar, there are important distinctions to be made between them. A prohibition upon speech may be void for vagueness if it is not clearly defined. To avoid the potential chilling effect on free speech rights, the regulation must be in "terms susceptible of objective measurement." *Cramp v. Board of Public Instruction*, 368 *U.S.* 278, 286, 82 *S.Ct.* 275, 280, 7 *L.Ed.2d* 285, 291 (1961). As the Supreme Court explained in *Grayned v. City of Rockford*, 408 *U.S.* 104, 108–09, 92 *S.Ct.* 2294, 2299, 33 *L.Ed.2d* 222, 228 (1972), a vague law is one that:

'abut[s] upon sensitive areas of basic First Amendment freedoms,' . . . [and] 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.' [citations omitted].

Thus, the "void-for-vagueness" doctrine involves procedural due process considerations of fair notice and adequate warning. See *State v. Lashinsky*, 81 *N.J.* 1, 17–18 (1979); *Smith v. Goguen*, 415 *U.S.* 566, 572–73, 94 *S.Ct.* 1242, 1246–1247, 39 *L.Ed.2d* 605, 611–12 (1974); *Baggett v. Bullitt*, 377 *U.S.* 360, 372, 84 *S.Ct.* 1316, 1322, 12 *L.Ed.2d* 377, 385 (1964).

Prohibitions upon speech can also be void if they are too broad and far reaching in scope. "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 *U.S.* at 114, 92 *S.Ct.* at 2302, 33 *L.Ed.2d* at 231. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 *U.S.* 415, 433, 83 *S.Ct.* 328, 338, 9 *L.Ed.2d* 405, 418 (1963). In the final analysis:

[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose. [*Shelton v. Tucker*, 364 *U.S.* 479, 488, 81 *S.Ct.* 247, 252, 5 *L.Ed.2d* 231, 237 (1960) ].

Thus, while vagueness implicates notions of procedural due process as to the fairness and adequacy of warning, overbreadth involves substantive due process considerations concerning excessive governmental intrusion into protected areas. *Lashinsky*, 81 *N.J.* at 17–18. See *Gasparinetti v. Kerr*, 568 *F.2d* 311 (3 Cir.), cert. den., 436 *U.S.* 903, 98 *S.Ct.* 2232, 56 *L.Ed.2d* 401 (1977); *Landry v. Daley*, 280 *F.Supp.* 938, 951–52 (N.D.Ill.1968), appeal dismissed, 393 *U.S.* 220, 89 *S.Ct.* 455, 21 *L.Ed.2d* 392 (1968), rev'd on other grounds, *sub nom. Boyle v. Landry*, 401 *U.S.* 77, 91 *S.Ct.* 758, 27 *L.Ed.2d* 696 (1971).

 Ordinarily, speech restrictions will withstand constitutional scrutiny only if they are limited to prohibiting that speech which creates a "clear and present danger" of threatening some

substantial governmental interest unrelated to the suppression of expression. See *Brandenburg,* 395 *U.S.* 444, 89 *S.Ct.* 1827, 33 *L.Ed.2d* 430; *Bridges,* 314 *U.S.* 252, 62 *S.Ct.* 190, 86 *L.Ed.* 192. However, attorney extrajudicial speech in the criminal trial setting presents special concerns.

Some guidance in this regard is furnished by the Supreme Court's landmark decisions concerning prejudicial trial publicity. See *Sheppard v. Maxwell,* 384 *U.S.* 333, 86 *S.Ct.* 1507, 16 *L.Ed.2d* 600 (1966); *Estes v. Texas,* 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.* 2d 543.

In *Estes,* the Supreme Court stressed the paramount importance of protecting the defendant's right to a fair trial. The opinion noted: "We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs." *Id.* at 540, 85 *S.Ct.* at 1632, 14 *L.Ed.2d* at 549.

In *Sheppard,* the Supreme Court observed:

Effective control of [counsel]—concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity . . . .

. . . [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity . . . . If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. [384 *U.S.* at 361–63, 86 *S.Ct.* at 1521–1522, 16 *L.Ed.2d* at 619–620 (dictum)].

Thus, the Supreme Court targeted the evil as public speech that creates "a reasonable likelihood . . . [of] prevent[ing] a fair trial." *Id.*

This Court has similarly recognized that extrajudicial speech by attorneys participating in a criminal case is not absolutely

protected under the First Amendment if it will have a deleterious impact upon the fairness and integrity of the proceeding. In a strongly worded statement in *Van Duyne*, we expressed the view that Canon 20, the predecessor to *DR* 7–107(D), proscribed attorney extrajudicial statements that have the capacity to interfere with a fair trial.[3] We noted:

> The right of the State to a fair trial cannot be imperiled or diluted by [an attorney's] out-of-court assertions ... to news media on the subject of his client's innocence. The courtroom is the place to settle the issue and comments before or during the trial which have the capacity to influence potential or actual jurors to the possible prejudice of the State are impermissible. [43 *N.J.* at 389]

Many courts have upheld the constitutional validity of the "reasonable likelihood" standard for limiting lawyer extrajudicial comments during criminal trials. See, *e.g., Hirschkop*, 594 *F.*2d at 368–70; *Tijerina*, 412 *F.*2d at 667; *Younger v. Smith*, 30 *Cal.App.*3d 138, 106 *Cal.Rptr.* 225 (1973); *People v. Dupree*, 88 *Misc.*2d 780, 388 *N.Y.S.*2d 203 (Sup.Ct.1976). *Cf. State v. Ross*, 36 *Ohio App.*2d 185, 304 *N.E.*2d 396 (Ct.App.1973), appeal dismissed, 415 *U.S.* 904, 94 *S.Ct.* 1397, 39 *L.Ed.*2d 461 (1974) (court refused to grant attorney permission to appear *pro hac vice* in criminal trial because the attorney said he would only limit his public comments to those not creating a "clear and present danger" to the proceedings); *Widoff v. Disciplinary Board*, 54 *Pa.Cmmw.Ct.* 124, 420 *A.*2d 41 (1980), aff'd sub nom. *Cohen v. Disciplinary Board*, 494 *Pa.* 129, 430 *A.*2d 1151 (1981), appeal dismissed, —— *U.S.* ——, 102 *S.Ct.* 1266, 71 *L.Ed.*2d 454 (1982) ("reasonable likelihood" standard applied in context of administrative hearing). See also *Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free*

---

[3]Canon 20 of the old ABA Canons of Professional Ethics provided:

Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstance of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An *ex parte* reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in the extreme cases it is better to avoid any *ex parte* statement.

*Press—Fair Trial" Issue,* 87 *F.R.D.* 519, 523–24 (1980); Cole and Spak, "Defense Counsel and the First Amendment: A Time to Keep Silence, and a Time to Speak," 6 *St. Mary's L.J.* 347 (1974); Note, "Professional Ethics and Trial Publicity: What All The Talk Is About," 10 *Suffolk L.Rev.* 654 (1976); Note, "*Chicago Council of Lawyers v. Bauer*: Gag Rules—The First Amendment v. The Sixth Amendment," 30 *S.W.L.J.* 507 (1976).

Other courts have rejected the "reasonable likelihood" test and have applied a traditional First Amendment analysis, holding that the Constitution protects an attorney's right to make extrajudicial statements, except when those comments create a "clear and present danger" or a "serious and imminent threat" to the administration of justice. See, *e.g., Bauer,* 522 *F.*2d at 249; *In re Oliver,* 452 *F.*2d 111 (7 Cir. 1971); *Chase v. Robson,* 435 *F.*2d 1059 (7 Cir. 1970); *United States v. Garcia,* 456 *F.Supp.* 1354 (D.P.R.1978); *Hamilton v. Municipal Court for Berkeley-Albany Judicial District,* 270 *Cal.App.*2d 797, 76 *Cal.Rptr.* 168, *cert. den.* 396 *U.S.* 985, 90 *S.Ct.* 479, 24 *L.Ed.*2d 449 (1969). See also *Model Rules of Professional Conduct, ABA Commission of Evaluation of Professional Standards* at 270, 275 (Alt. Draft 1981) (recommending change in standard to proscribe only those comments that have a "substantial likelihood of materially prejudicing" the trial, with change intended to incorporate "clear and present danger" test); *ABA Standards 1978, supra* (recommending change to "clear and present danger" test and suggesting constitutional invalidity of present standard); Note, "Professional Responsibility—Trial Publicity—Speech Restrictions Must Be Narrowly Drawn," 54 *Texas L.Rev.* 1158 (1976).

In addressing the issue of prejudicial out-of-court statements by attorneys in *Sawyer,* the Supreme Court refused to endorse the clear and present danger test. There, an attorney was suspended from the practice of law for making an out-of-court speech in which she allegedly maligned the judge before whom she was appearing as defense counsel in a pending conspiracy case. Although five members of the Court voted to overturn the suspension because of insufficient evidence of professional

misconduct, four dissenting justices, joined by concurring Justice Stewart, questioned the applicability of the clear and present danger test to situations involving attorneys who make extrajudicial statements about ongoing cases in which they are participating.

We are satisfied that the clear and present danger formulation is not constitutionally compelled when the subject of the restriction is the extrajudicial speech of attorneys participating in criminal trials. The clear and present danger test is neither more precise nor more certain in meaning than is the reasonable likelihood test. While the clear and present danger test may be stricter than the reasonable likelihood standard, strictness does not import more precision or imply greater clarity. As a test, it has generated its own linguistic equivalents, such as "serious and imminent threat," *Bauer*, or "substantial likelihood of materially prejudicing the trial," *ABA Standards 1978, supra.* The clear and present danger standard is no more self-defining or self-revealing than are any of these alternative formulations. Thus, from the standpoint of verbal clarity, the clear and present danger test presents as many difficulties as the reasonable likelihood standard.

Contrary to Hinds' assertions, the reasonable likelihood standard is susceptible of objective measurement. It is expressed in straightforward language, in terminology that is commonly and frequently used in communications. *Younger*, 30 *Cal.App.*3d at 163–64, 106 *Cal.Rptr.* at 241–42. Whether a particular utterance creates a reasonable likelihood of affecting trial fairness will depend upon the special circumstances of each case. This inquiry involves a careful balancing and consideration of all relevant factors. *Cf. Landmark*, 435 *U.S.* at 842–43, 98 *S.Ct.* at 1543–1544, 56 *L.Ed.*2d at 13 (such balancing required in a "free press" situation). These factors can include such matters as the nature of the statement, the timing of the statement, the extent to which the information has been publicized, the nature of the proceeding and its vulnerability to prejudicial influence, the attorney's status in the case, the lawyer's unique position as an

informed and accurate source of information in the case, and the effect of unrestricted comment on the interest of the litigants and the integrity of the proceeding.[4] See Note, "A Constitutional Assessment of Court Rules Restricting Lawyer Comment on Pending Litigation," 65 *Cornell L.Rev.* 1106, 1120–21 (1980); *Model Rules 1981, supra* at 275–76.

In terms of whether the reasonable likelihood standard is overbroad, we agree with Hinds that this test is not as narrow

---

[4]We note that Hinds faced these charges because of his association with the *defense* in a criminal trial. The status of an attorney as defense counsel, as opposed to prosecutor, is a relevant factor to consider in imposing speech restrictions. There are clear differences between the two that affect their respective abilities to influence the proceedings through extrajudicial statements.

Several commentators have suggested that criminal defense attorneys should not be subject to the same strict speech limitations as prosecutors. See, *e.g.*, Freedman and Starwood, "Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys: Ratio Decidendi v. Obiter Dictum," 29 *Stan.L.Rev.* 607 (1977); Hirst, "Silence Orders—Preserving Political Expression by Defendants and Their Lawyers," 6 *Harv.Civ.Rts.— Civ.Lib.L.Rev.* 595, 604, 606–08 (1976); Isaacson, "Fair Trial and Free Press: An Opportunity for Coexistence," 29 *Stan.L.Rev.* 561, 568–70 (1977); Kaplan, "Of Babies and Bathwater," 29 *Stan.L.Rev.* 621, 625 n.13 (1977); Comment, "Professional Ethics and Trial Publicity: Another Constitutional Attack on *DR* 7–107—*Hirschkop v. Snead*," 14 *U.Rich.L.Rev.* 231, 225–236 (1979). These commentators essentially reason that the constitutional guarantee of a fair trial belongs to the defendant alone, not the prosecution. See *U.S.Const.*, Amends. IV, V, VI. Thus, regulations restricting free speech in this context should be tailored to advance the defendant's constitutionally protected interest in a fair trial. Moreover, they point out that "the scales of justice . . . are weighed extraordinarily heavy against an accused after his indictment." *Bauer*, 522 *F.*2d at 250, quoted in Freedman and Starwood, 29 *Stan.L.Rev.* at 611. Therefore, they conclude that the defendant and his counsel need access to the public to combat the stigma of an indictment.

When extrajudicial statements of defense attorneys are prohibited, the interest sought to be protected is not simply the right of the accused to a fair trial. Defense attorneys are also silenced because of the government's interest in the "fair administration of justice" and basic "integrity of judicial processes." *Hirschkop*, 594 *F.*2d at 362, 376. As we have noted, this is a significant interest which justifies speech restrictions on attorneys

or limited in its reach as the clear and present danger standard. We must decide, however, not whether this test is broader than another possible standard but whether it is no broader than necessary and essential to protect the substantial governmental interest involved.

We find the reasonable likelihood test to be a permissible standard for restricting free speech in this special context. We are impelled to this conclusion because of both the nature of the governmental interest involved and the status and role of attorneys in effectuating that interest. Society has an important stake in the proper administration of criminal justice. The reconciliation of intersecting values in the administration of criminal justice—the rights of an accused and society's needs for safety and protection—constitutes one of the most difficult and sensitive tasks of government. The State's concern for an effective, efficient, fair and balanced system of criminal justice is unquestioned. It has been accorded a high priority in terms of government's responsibility to its citizens. The significance of this governmental obligation justifies scrupulous and conscientious measures to assure its fulfillment.

Furthermore, attorneys perform a unique service in the criminal justice system. As the Supreme Court has emphasized, "[t]he state's interest in the professional conduct of attorneys involved in the administration of criminal justice is of special importance." *Middlesex Ethics Comm.,* —— *U.S.* at ——, 102 *S.Ct.* at 2522. While the administration of criminal justice is a governmental responsibility, it cannot be accomplished through fiat or authoritarian methods. Its proper functioning depends upon all who participate in the process. *Sheppard,* 384 *U.S.* at 361–62, 86 *S.Ct.* at 1521–1522, 16 *L.Ed.*2d at 619–20. It utilizes adversarial, not inquisitorial, techniques. Lawyers in criminal cases represent opposing parties and conflicting interests. They

---

associated with the case, whether as prosecutor or defense counsel. See *supra* at 615.

must, therefore, discharge their professional responsibilities ethically as well as skillfully. They must do so according to carefully prescribed rules within a procedural framework designed to assure due process and fairness to both the accused and the public. The sole objective of this system is to secure justice. The benchmark of its success is the reaching of a just result based solely on properly adduced, competent evidence that is relevant to the truth of the criminal charges.

These considerations, in our view, require ethical constraints upon attorneys. These must include reasonable restrictions upon their extrajudicial speech to discourage and prevent extraneous matters from being insinuated into a criminal case. Such outside influences, if left unchecked, could divert the search for truth and wreck the intricate machinery of the criminal justice system. The reasonable likelihood test expressed in *DR* 7–107(D) is necessary and essential to the achievement of these objectives and, therefore, does not suffer from constitutional overbreadth.[5]

---

[5]An overbreadth analysis also necessarily involves consideration of whether the government's substantial interest could be adequately protected through some means other than a speech restriction. If an alternative form of regulation would combat the danger without infringing upon First Amendment rights, then a speech restriction would be unnecessary and, therefore, unconstitutional. See *Sherbert v. Verner*, 374 *U.S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.2d* 965 (1963). A variety of alternatives to attorney speech restrictions exist for protecting a fair trial, including: (1) exclusion of the public from those hearings during trial held in the absence of jury; (2) continuances; (3) change of venue; (4) jury waiver; (5) searching voir dire; (6) selection of jury from locality outside area of extensive news coverage; (7) sequestration of jury; (8) admonitions to jury to avoid news reports relating to trial; (9) cautionary instructions to media regarding critical matters; (10) examination of jurors regarding possible exposure to prejudicial information during trial; (11) declaring a mistrial, and (12) granting a new trial. *Cf. State v. Allen*, 73 *N.J.* 132, 160–61 (1977) (court should attempt other protective devices before imposing "gag" order on press).

These other options, taken singly or together, do not preclude the imposition of attorney free speech restrictions because, in the criminal trial setting, courts have an overriding obligation to "prevent ... prejudice at its inception," *Sheppard*, 384 *U.S.* at 363, 86 *S.Ct.* at 1522, 16 *L.Ed.2d* at 620,

The question next presented is whether Hinds' remarks were reasonably likely to interfere with a fair trial such that they violated the standard of *DR* 7–107(D). On this ultimate question there has been no adequate factual record developed. The Ethics Committee never conducted a hearing on this or any other issue. Moreover, while the federal district court developed a lengthy record in the proceedings before it, the concern in that case was not with whether Hinds' statements created a reasonable likelihood of affecting a fair trial, nor was there a finding to that effect.[6]

Even if the record below, including the federal court proceedings, were capable of being canvassed for factfindings, the Ethics Committee could not have known to resolve this issue by applying the balancing test that we have enunciated for the first time in this opinion. See *supra* at 622–623. We reiterate that this balancing process for determining when an attorney's extrajudicial remarks are reasonably likely to affect a fair trial entails careful consideration of such factors as the status of the attorney, the nature and content of the statement, the timing of the statement, and the context in which it was uttered. The reasonable likelihood standard requires a showing by clear and convincing evidence that an attorney's extrajudicial speech truly jeopardized trial fairness, a determination that can

---

rather than to wait until after the fact to attempt remedial action. *Hirschkop*, 594 *F*.2d at 365. Certain of these measures, such as change of venue, continuances and searching voir dire, simply are not effective alternatives. Moreover, ready resort to these alternative steps might impinge upon other constitutional guarantees, such as the defendant's right to a speedy trial or trial by jury. 594 *F*.2d at 366–67. Thus, while alternative approaches to dealing with the problem of prejudicial publicity exist, they do not obviate the need for properly fashioned restrictions on the extrajudicial speech of attorneys participating in criminal trials.

[6]Although the parties apparently stipulated that they were willing to rely on the record developed in the federal proceeding for purposes of factfinding, Hinds now questions the effect of that stipulation. We find that record to be insufficient for making factual determinations in this case, which involves very different questions from those raised in the federal action.

be reached only by thoroughly balancing all relevant considerations.

## III

In deciding whether a remand is necessary in this case, we must consider not only whether Hinds' speech offended the reasonable likelihood standard but also the extent to which Hinds was associated with the defense in this criminal trial. These combined questions are implicated in the application of *DR* 7–107(D), and the need for a remand should take into account both matters.

The attorney's status in the case is highly relevant and may indeed be determinative on the question of whether he has violated *DR* 7–107(D). The prohibition of *DR* 7–107(D) does not apply unless the speech is made by an attorney "associated with" the criminal trial. Hinds contends that this aspect of the rule also suffers from constitutional vagueness and overbreadth.

In dealing with this contention as a facial attack upon the rule, we accept the notion that by restricting the extrajudicial speech of attorneys, *DR* 7–107(D) was adopted in order to "stop . . . prejudice at its inception," *Sheppard*, 384 *U.S.* at 363, 86 *S.Ct.* at 1522, 16 *L.Ed.*2d at 620. The rule seeks to prevent attorneys with a special status in the case from making disclosures that are prejudicial to the trial process.

Attorneys of record clearly fall within the class of lawyers who have a special connection with the case. Such attorneys have direct responsibility for the representation of parties and the actual conduct of a trial. They are individuals who have confidential information and an intimate knowledge of the merits of the prosecution. Their views are invested with particular credibility and weight in light of their positions. Hence, their statements relating to the trial are likely to be considered knowledgeable, reliable and true.

The question remains whether an attorney who is not an attorney of record but is closely "associated with" the trial in

other ways can be subject to the rule's sanctions. While the local Ethics Committee apparently believed that Hinds was not an attorney of record in the criminal trial about which he spoke publicly, it nevertheless charged him with violating *DR 7–107(D)*. It apparently believed that there was sufficient information indicating that he was "associated with" the Chesimard trial, at least for purposes of lodging charges against him.

We are satisfied that *DR 7–107(D)* was intended to be applied to attorneys who have such an association with the defense of a criminal trial that extrajudicial statements made by them about the proceedings have a unique capacity for prejudicial impact upon the trial process. Accordingly, we now hold that under *DR 7–107(D)* an attorney who cooperates with the defense of a criminal prosecution on a regular and continuing basis, provides legal assistance in connection with the defense of a criminal charge, and holds himself out to be a member of the defense team is to be considered "associated with" the defense for purposes of invoking this disciplinary rule.

So interpreted, we conclude that the rule is neither vague nor overbroad. While the rule does not define the term "associated with," it is not an esoteric or abstruse expression. It fairly imports a common sense meaning and is susceptible to a simple interpretation in accordance with common experience and ordinary understanding. The term is, therefore, adequate to inform and forewarn attorneys who potentially may be subject to the strictures of the rule. Consequently, the rule is not impermissibly vague in its application to attorneys associated with the defense of a criminal case.

Extending the coverage of the rule to include not only attorneys of record but also attorneys associated with the defense of a criminal prosecution does not constitute overreaching. Attorneys falling into both categories possess special knowledge and information relating to the criminal action. They are readily perceived as authoritative persons whose remarks carry the mark of reliability, authority and accuracy. Comments made by

such attorneys about ongoing trials can carry significant weight in the minds of members of the public, including potential jurors, witnesses and others who may have a role to play in the trial. Restrictions upon the attorneys' freedom to comment about the case are necessary to assure that the fairness of the criminal trial will not be jeopardized. We are thus satisfied that *DR* 7–107(D) is constitutional as applied to this class of individuals.

## IV

Although we determine that *DR* 7–107(D) is constitutional, under the circumstances of this case, we conclude that Hinds should not be found in violation of the rule. We do so for two reasons. First, there is sufficient doubt as to the underlying facts regarding Hinds' relationship with the Chesimard defense to prevent an ultimate conclusion from being drawn on this important issue. That factual question was never conclusively resolved. The Ethics Committee conducted no hearing on the issue of Hinds' connection with the defense. In fact, it conducted no hearing whatsoever. Moreover, the federal district court that reviewed this case was not required to determine whether Hinds was "associated with" the Chesimard defense and expressly declined to do so. *Garden State Bar*, No. 78–273 at 2. Therefore, the extent of Hinds' association with the defense team is not entirely clear or free from dispute.[7]

---

[7]While we are unable to resolve this particular issue, it is significant to note the following salient aspects of Hinds' association with the case, which, if properly established and weighed in the balancing test, militate strongly in favor of a finding that he was "associated with" the defense for purposes of applying *DR* 7–107(D). Hinds did represent Chesimard in a separate federal civil action while she was under criminal indictment for murder. Although Hinds claims that he was not an actual member of the Chesimard defense team, on at least three occasions Hinds was named in official court records as one of Chesimard's defense attorneys. Moreover, videotapes of the court proceedings show that Hinds sometimes sat directly behind the main defense counsel table and in front of the courtroom railing, a position that usually separates the general public from interested parties. Hinds also acknowl-

Our second and primary reason for refusing to apply *DR* 7–107(D) in this instance is based on elementary fairness. This is the first time we have addressed the question of whether an attorney in Hinds' position would be considered "associated with" a case for purposes of falling within the rule's coverage. Furthermore, as already pointed out, this decision also constitutes the first time we have explained the balancing test to be applied for determining whether the extrajudicial speech of an attorney associated with an ongoing criminal trial is reasonably likely to interfere with a fair trial. See *supra* at 622–623. We therefore deem it appropriate that *DR* 7–107(D) be applied prospectively only and that Hinds be given the benefit of this ruling. Compare *In re Smock*, 86 *N.J.* 426 (1981), with *In re Wilson*, 81 *N.J.* 451 (1979). *Cf. State v. Burstein*, 85 *N.J.* 394 (1981) (first judicial interpretation of otherwise clear provision of wiretapping statute applied prospectively only).

In terms of the propriety of sanctions, we are not engaged in the enforcement of the State's criminal laws. Rather, we are addressing disciplinary rules governing the professional conduct of attorneys. Our major concern is the ethics lesson to be extracted from this case and the prophlylactic effect of our decision in explaining the appropriate ethics principle. Our purpose is not to punish but to enlighten and improve the profession for the benefit of the public. See *In re Baron*, 25 *N.J.* 445, 449 (1957). Furthermore, we are dealing here not with unethical conduct which bespeaks corruption, fraud, breach of trust, professional negligence or some form of criminality. The problematic conduct in this case is speech, an activity protected under the First Amendment. While such speech may under limited circumstances constitute unprofessional conduct, we

---

edged that he aided the defense in several ways, allowing the defense team to use his office and providing copies of the pleadings he had previously prepared in the federal civil action on Chesimard's behalf for inclusion in the defense's unsuccessful motion to have Chesimard's criminal trial removed to federal court. He also represented himself to be the spokesperson for the defense when he made his public statements.

should not rush to impose sanctions upon expressional activity unless that course of action is clear and unavoidable. In this instance we find the imposition of punishment unnecessary to promote our ethical aims and, therefore, refrain from doing so.

## V

Since we have determined that *DR* 7–107(D), as construed by us in this decision, is to be given prospective effect only and, therefore, should not be applied to Hinds, the question arises whether he can nevertheless be punished under *DR* 1–102(A)(5). This disciplinary rule sanctions attorney conduct that is "prejudicial to the administration of justice." Hinds contends that application of that rule to these facts would constitute a violation of his free speech rights under the First Amendment because the rule is impermissibly vague and overbroad.

*DR* 1–102(A)(5) is framed in broad language and gives the appearance of an aspirational standard, rather than a disciplinary rule. Courts have held that a broad disciplinary rule may acquire constitutional certitude when examined in light of traditions in the profession and established patterns of application. See *Parker v. Levy,* 417 *U.S.* 733, 94 *S.Ct.* 2547, 41 *L.Ed.2d* 439 (1974); *In re Ruffalo,* 390 *U.S.* 544, 88 *S.Ct.* 1222, 20 *L.Ed.2d* 117 (1968); *In re Bithoney,* 486 *F.2d* 319 (1 Cir. 1973) (dictum).

Attorney disciplinary rules have long been framed in general, rather sweeping language. The legal profession's cardinal ethical edict—"to avoid even the appearance of impropriety"—suggests that a lawyer should refrain from acting if there is any basis for suggesting that his conduct might be questioned. See Canon 9 of the Code of Professional Responsibility. As one court explained in affirming the constitutionality of *DR* 1–102(A)(5): "[T]he rule was written by and for lawyers. The language of a rule setting guidelines for members of the bar need not meet the precise standards of clarity that might be required of rules of conduct for laymen." *In re Keiler,* 380 *A.2d* 119, 126 (D.C.1977). See *State v. Martindale,* 215 *Kan.* 667, 527 *P.2d* 703 (1979).

██ Moreover, unlike *DR* 7–107, which has rarely been applied, *DR* 1–102(A)(5) has regularly been invoked in disciplinary actions. The New Jersey cases disclose a pattern of applying *DR* 1–102(A)(5) in conjunction with other more specific disciplinary rules to sanction attorney misconduct. See, *e.g., In re Clark,* 83 *N.J.* 458 (1980) (also violating *DR* 6–101, 9–102); *Wilson,* 81 *N.J.* 451 (also violating *DR* 9–102). And on those few occasions when the rule has served as the sole basis for discipline, it has been applied only in situations involving conduct flagrantly violative of accepted professional norms. See, *e.g., In re Schleimer,* 78 *N.J.* 317 (1978) (false swearing). Thus, the rule's broad language proscribing acts "prejudicial to the administration of justice" takes on sufficient definition to pass constitutional muster, given these prior judicial determinations narrowing its scope to particularly egregious conduct.[8] See *Committee on Professional Ethics v. Durham,* 279 *N.W.*2d 280 (Iowa 1979).

Several considerations militate against the application of *DR* 1–102(A)(5) under the circumstances of this case. Such a determination would require a factual inquiry similar to that involved in the application of *DR* 7–107, the primary rule governing attorney extrajudicial speech. The effect or impact of the attorney's speech upon the criminal case and the attorney's status in the case would also be relevant in determining whether the attorney's conduct was prejudicial to the administration of justice under *DR* 1–102(A)(5). Because the record in this case is inadequate to demonstrate whether Hinds was "associated with" the Chesimard case or whether his remarks were reasonably likely to interfere with the criminal trial for purposes of applying *DR* 7–107(D), we are satisfied that the record is similarly deficient for purposes of applying *DR* 1–102(A)(5).

---

[8]The latest version of the Model Rules of Professional Conduct would do away with *DR* 1–102(A)(5), apparently because the rule appears redundant. See *Model Rules 1981, supra* at 10–14. However, the mere fact that this rule is somewhat redundant does not make it constitutionally infirm.

It seems quite certain that, in the separate application of this disciplinary rule, the First Amendment would require a higher standard than the reasonable likelihood formulation of *DR 7–107*. The critical distinction in the application of the two disciplinary rules hinges upon the status of the attorney whose speech is subject to scrutiny. As already shown, an attorney who is specially connected with an ongoing criminal trial under *DR 7–107* may be subject to the broader restraints of the reasonable likelihood standard. In contrast, *DR 1–102(A)(5)* would come into play when the attorney is not particularly or specially connected with or involved in a pending criminal matter. In that context, there would appear to be no reason cognizable under First Amendment principles for distinguishing such an attorney from other citizens. An attorney with no supervening professional responsibilities in a pending criminal case would seemingly enjoy the same free speech rights as any other citizen.[9] See *R.M.J.*, —— *U.S.* at —— — ——, 102 *S.Ct.* at

---

[9]Inconsistencies in the case law also suggest the need for a strict standard. Courts in other jurisdictions have reached wildly divergent results in deciding whether to impose sanctions in situations such as this one, where the attorney's speech consisted of mere criticism of judges. For cases imposing sanctions for criticizing judges, see, *e.g., Eisenberg v. Boardman*, 302 *F.Supp.* 1360 (D.Wis.1969) (attorney circulated statement designed to humilate judge); *In re Lacey*, 283 *N.W.2d* 250 (S.D.1979) (attorney quoted in press as saying "state courts were incompetent and sometimes downright crooked"); *In re Raggio*, 87 *Nev.* 369, 487 *P.2d* 499 (1970) (attorney wrote magazine article criticizing judges in intemperate terms). See also *In re Friedland*, 268 *Ind.* 536, 376 *N.E.2d* 1126 (1978) (attorney suspended for referring to paternity hearing as "ordeal," "travesty," and "the biggest farce I've ever seen"); *In re Paulsrude*, 311 *Minn.* 303, 248 *N.W.2d* 747 (1979) (attorney disbarred for in-court remarks, which included calling the judge a "horse's ass" after an adverse ruling and labelling the proceedings a "kangaroo court"). For cases not disciplining attorneys for criticizing judges, see, *e.g., State v. Nelson*, 210 *Kan.* 637, 504 *P.2d* 211 (1972) (no discipline imposed where attorney made only general accusations and was speaking as losing party in litigation); *Justices of Appellate Division v. Erdmann*, 33 *N.Y.2d* 559, 301 *N.E.2d* 426, 347 *N.Y.S.2d* 441 (1973) (attorney not subject to discipline even though he called appellate judges "whores who become madams," and claimed that the only way to become a judge was "to be in politics or to buy it"); *State Bar v. Semaan*, 508 *S.W.2d* 429 (Tex.Civ.App.1974) (no discipline imposed against

935–38, 71 *L.Ed.2d* at 70–75; *Konigsberg,* 353 *U.S.* at 273, 77 *S.Ct.* at 733, 1 *L.Ed.2d* at 825; *Hirschkop,* 594 *F.2d* at 366; *id.* at 381 (Winter, J., and Butzner, J., concurring and dissenting); *Polk v. State Bar of Texas,* 374 *F.Supp.* 784, 787–88 (N.D.Texas 1974).

 Because *DR* 1–102(A)(5) applies to an attorney in his capacity as an ordinary citizen, the standard for invoking the rule's sanctions against speech should be that of a "clear and present danger" or, to use an alternative formulation, a "serious and imminent threat" to the fairness and integrity of the judicial system. While we recognize the absence of an adequate record in this case, the facts that have thus far been presented do not suggest that Hinds' statements created a "clear and present danger" of prejudicing the administration of justice such that he could be found to have committed an ethical violation. If we were called upon to address that proposition, we would have to "be on guard against confusing offenses to [our] sensibilities with obstruction to the administration of justice." *Brown,* 356 *U.S.* at 153, 78 *S.Ct.* at 625, 2 *L.Ed.2d* at 596.

 We need not further discuss the need for additional proceedings or the significant question of whether the First Amendment requires the application of a stricter standard than the reasonable likelihood test under *DR* 1–102(A)(5). The reasons which have deterred us from reaching a determination of the issues posed by the charges under *DR* 7–107(D) apply as well to *DR* 1–102(A)(5). Since our ruling on the meaning and application of *DR* 7–107(D) will be given prospective effect only, it is unnecessary, if not unwarranted, to attempt to discipline Hinds under *DR* 1–102(A)(5).

attorney who wrote letters to newspapers critical of a judge's qualifications to hold office). See generally Annot. "Attorney's Criticism of Judicial Acts as Ground for Disciplinary Action," 12 *A.L.R.3d* 1408 (1967).

## VI

Thus, we conclude that the reasonable likelihood standard of *DR* 7–107(D) is constitutional as applied to the extrajudicial statements of an attorney who is associated with a criminal trial, where the statements are about the trial and are intended to be disseminated publicly.

We limit this holding to the criminal context only. With the personal liberty of the defendant at stake and the need to reach the right result so vital, a criminal case presents unique problems of trial fairness that compel us to take every step possible to protect the integrity of that process.[10] Therefore, our decision today should not be interpreted as approving of the reasonable likelihood standard to restrict attorney speech in any other context but a criminal trial.

We decline, however, to find Hinds in violation of any ethical rule. We do so for several reasons. First, because the District Ethics Committee conducted no hearing on this case, we are presented with an inadequate factual record on which to base a decision. Second, because this case involves the application of an ethical precept rather than a criminal law, we view the decision itself as a sufficient explanation of the ethical responsibility of attorneys and find no need for punishment. Third,

---

[10]As previously noted, the preservation of trial fairness is a significant and, indeed, compelling State interest in the criminal context. See *supra* at 615–617. However, civil cases present very different considerations. Civil actions sometimes take years to complete and often involve crucial issues of public importance. *Hirschkop*, 594 *F.2d* at 371–72; *Bauer*, 522 *F.2d* at 257–58. Moreover, there is far less evidence that statements by lawyers involved in civil trials can prejudice such proceedings. *Hirschkop*, 594 *F.2d* 373–74. Therefore, the two federal Circuit Courts which have addressed this issue have found the "reasonable likelihood" standard unconstitutional as applied to attorneys associated with a civil case. *Hirschkop; Bauer.*

In addition to sections (A) through (E), *DR* 7–107 also contains provisions dealing with civil trials, (G), administrative actions, (H), disciplinary actions, (F), and juvenile hearings, (F). Since we are faced in this case with a criminal trial situation, we need not consider the constitutionality of the "reasonable likelihood" test in these other contexts and refrain from doing so.

because this opinion represents the first opportunity we have had to define the proper scope of *DR* 7–107(D), the primary disciplinary rule sought to be applied in this case, we deem it appropriate to give that rule prospective effect only. Finally, there being no present basis for imposing discipline under *DR* 7–107(D), the related charges under *DR* 1–102(A)(5) should likewise be dismissed.

Accordingly, the charges against Hinds are dismissed.

PASHMAN, J., concurring.

I concur with the majority's conclusion that the "reasonable likelihood" test of DR 7–107(D) does not violate the constitutionally protected free speech rights of attorneys while they are participating in criminal trials. I do so because the majority has construed this standard to require a "showing by clear and convincing evidence that an attorney's extrajudicial speech truly jeopardized trial fairness. . . ." *Ante* at 626. This test precludes the Court from disciplining an attorney based on the vague feeling that his statement could possibly, or even foreseeably, have affected the trial. Rather, before discipline may be imposed, the Court must have a firm conviction that the statement created an immediate danger of jeopardizing the fairness of the trial. Moreover, the restriction on speech is narrowly limited to attorneys associated with the prosecution or defense of criminal trials. It does not extend to civil trials; nor does it encompass attorneys who are not associated with the case.

I also agree with the majority's conclusion that an "attorney with no supervening professional responsibilities in a pending criminal case would seemingly enjoy the same free speech rights as any other citizen." *Ante* at 633. I therefore concur that the Constitution prohibits the discipline of attorneys for exercising their right to free speech when they are not directly associated with a criminal trial unless that speech creates a clear and present danger of prejudicing the administration of justice. *Ante* at 634.

I write because I believe that the justification for applying the clear and present danger test to attorneys not associated with a criminal case requires fuller elaboration. I also think that the application of that clear and present danger test to this case requires greater discussion so that our decision today does not chill protected speech by attorneys.

As the majority notes, the First Amendment protects public speech critical of the government. "The Constitution unquestionably guarantees the right of citizens to criticize public officials, including judges." *Ante* at 613 (citations omitted). The freedom of our citizens to say what they think of public officials is our firmest check on government tyranny. This Court has stated that freedom of speech

> fosters the criticism of official conduct that is necessary to make government responsive to citizens. That is why democracies do not punish inaccurate speech. [*Maressa v. New Jersey Monthly*, 89 *N.J.* 176 at 201 (1982)]

Judges are public officials. As part of the state government, they are subject to public criticism like any other official. *In re Sawyer*, 360 *U.S.* 622, 666, 79 *S.Ct.* 1376, 1397, 3 *L.Ed.*2d 1473, 1499 (1959) (Stewart, J., concurring). Public debate about courts, and even the performance of specific judges, has long been part of our political and legal system.

Like other citizens, attorneys are entitled to speak freely. This right is guaranteed by the First Amendment to the Constitution. *Ante* at 614–615. *See R.M.J.*, —— *U.S.* ——, ——, 102 *S.Ct.* 929, 935–38, 71 *L.Ed.*2d 64, 70–75 (1982); *Konigsberg v. State Bar*, 353 *U.S.* 252, 273, 77 *S.Ct.* 722, 733, 1 *L.Ed.*2d 810, 825 (1957). Since attorneys are officers of the courts, they may be constitutionally subject to certain limitations on their speech to protect the fairness of criminal trials, *see ante* at 615--616. However, when attorneys are not direct participants in the criminal proceedings there is little, if any, justification for imposing greater limits on their speech than those limits that apply to the general public. I believe that the Constitution demands such a result. Lawyers do not possess any inside information about a trial in which they are not participating;

nor do they speak for any of the parties. The only difference between such attorneys and the general public is that attorneys may know more about trials and the conduct of specific judges. Because of this knowledge, their statements may be more valuable to the public or have a greater impact on public opinion. However, their expertise does not by itself create an increased danger of prejudice to the fairness of the trial.

Justice Stewart has distinguished between lawyers actively participating in criminal trials and those who are not. *In re Sawyer*, 360 *U.S.* at 666, 79 *S.Ct.* at 1397, 3 *L.Ed.*2d at 1499 (concurring opinion). He suggested that the Constitution did not permit the same restrictions on attorneys not immediately engaged in the litigation. "Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice." *Id.* I agree with this distinction.

Ordinarily, restrictions on speech are prohibited by the Constitution unless they are limited to speech that creates a "clear and present danger" of harming a compelling state interest unrelated to the suppression of speech. *See ante* at 618–619; *Brandenburg v. Ohio*, 395 *U.S.* 444, 89 *S.Ct.* 1827, 33 *L.Ed.*2d 430 (1969); *Bridges v. California*, 314 *U.S.* 252, 62 *S.Ct.* 190, 86 *L.Ed.* 192 (1941). This standard is the only appropriate one for determining whether this Court may discipline an attorney for statements critical of a criminal trial judge when that attorney is not directly associated with the case. See *ante* at 633–634. Attorneys cannot be disciplined under DR 1–102(A)(5) for out-of-court statements unless their speech presents a clear and present danger of interfering with the administration of justice or otherwise harming a compelling state interest.

In this case, Hinds called a press conference to state that the trial of Joanne Chesimard was "legalized lynching," a "travesty," and a "kangaroo court." He claimed that the judge lacked "racial sensitivity." *Ante* at 610–611. Hinds did not make his statements inside the courtroom. He did not address it to

any juror or potential witness. His statement had nothing to do with the specific merits of the case. Hinds spoke as Director of the National Conference of Black Lawyers about a case which had national significance. I do not believe that these statements posed a clear and present danger of threatening the fairness of Joanne Chesimard's trial. There is no question that an ordinary citizen would be absolutely free to make these statements in public. I do not think any lawyer can be forbidden from making such statements if he is not associated with the case.[1] This is not the type of conduct that is encompassed by the prohibition against prejudicing the administration of justice. Because these statements did not pose a clear and present danger of prejudicing the administration of justice, Hinds did not violate DR 1–102(A)(5).

I recognize, of course, that public criticism of judges might reduce respect for the legal system. This criticism, and the possible loss of respect, may sometimes be undeserved. Yet the Constitution does not permit us to coerce citizens, including attorneys, to silently acquiesce in official acts that they deplore. As we stated in *Maressa v. New Jersey Monthly, supra* :

Sometimes published statements will hurt. Sometimes they will turn out to be untrue. Nevertheless, those regrettable consequences must yield to the need for an informed citizenry. [89 *N.J.* at 200]

Preventing a potential loss of respect by citizens for our legal institutions is not a sufficiently compelling government interest to justify restrictions on speech. *Bridges v. California,* 314 *U.S.* at 270, 62 *S.Ct.* at 197, 86 *L.Ed.* at 207. The lawyer's role as officer of the court is to protect the fairness of trials. While attorneys also have some responsibility for ensuring public confidence in the legal system, the system's public image cannot be protected at the cost of shielding judges from criticism. As Justice Black stated in *Bridges v. California, supra* :

---

[1]The question of Hinds' possible association with the case presents different problems. However, for the purpose of applying DR 1–102(A)(5), we assume that he is not associated with the case.

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect. [314 *U.S.* at 270–71, 62 *S.Ct.* at 197–198, 86 *L.Ed.* at 207]

It is also possible that criticisms of judges may turn out to be deserved. If this is so, then public criticism will in fact improve, rather than prejudice, the administration of justice. It will remind judges that they are officials of the state and that their actions, like those of other officials, will be reviewed and judged by the citizenry. There is no reason to believe that public statements about the official behavior of judges, even when not accurate, reduce the ability of our legal system to protect rights and do justice. There is every reason to believe that public scrutiny and debate about the conduct of public officials is a necessary element of our system of government. *See* Shattuck and Byers, "An Egalitarian Interpretation of the First Amendment," 16 *Harv.C.R.—C.L.L.Rev.* 377, 379–81 (1981). Unlike authoritarian governments that stifle both participation in politics and public debate, our system of government encourages citizens to speak their minds on issues of public importance. We do not fear criticism of officials. We welcome it and we expect it to be vigorous and forthright. We want active and informed citizens, not timid subjects.

Attorneys are more knowledgeable than other citizens about the official conduct of judges. Preventing attorneys from criticizing judges would go a long way toward insulating judges from public scrutiny. This is not a result that a democracy could tolerate.

CLIFFORD, J., concurring in result.

The Court concludes that the "reasonable likelihood" standard of *DR* 7–107(D), dealing with one phase of trial publicity, is the appropriate standard by which to test a lawyer's extrajudicial

comments where the speech is intended to be disseminated to the public. I agree. It is only to the extent that the majority holds back from a determination on whether Hinds violated that standard that I depart from Justice Handler's thoughtful opinion.

The pertinent part of the Rule bears repeating:

During the selection of a jury or a trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making any extra-judicial statement that he expects to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial * * *.

Hinds's remarks were deplorable in their absence of professionalism. But how is it *reasonably likely* that they could have "interfered with a fair trial"? They were directed solely at the trial judge, who commented, "I don't think it had any impact on the trial whatsoever," thereby displaying a desirable degree of epidermal impenetrability: the trial courtroom is no haven for the thin-skinned, either as lawyer or as judge. There was nothing in what respondent said that was likely to influence either the judge or a jury, which was still being selected. Had he announced, say, that a defendant's confession had been extracted by law enforcement officials' brutality, then a situation fraught with prejudice would have been presented. But these remarks, critical of the trial judge's alleged racial insensitivity, did not touch upon any substantive issues in the case. I think we should say that today, so that the bench and bar will understand what kind of content we would pour into the Disciplinary Rule.

Merle L. Meacham said that "[t]he trouble with being tolerant is that people think you don't understand the problem." I understand the problem. I just refuse to get exercised about respondent's lapse into uncivil sloganeering.

SCHREIBER, J., dissenting.

The Middlesex County Ethics Committee filed the following charge against the respondent Lennox Hinds:

At a press conference conducted on January 20, 1977, during the selection of a jury in the Joanne Chesimard criminal trial, and speaking as a member of the defense team, he termed the trial before Judge Theodore Appleby to be a "travesty"; he stated that Judge Appleby "does not have the judicial temperament or racial sensitivity to sit as an impartial judge"; he stated that "it was only after the trial began that we began to have fears that what we are seeing is a legalized lynching"; he stated that the members of the Joanne Cheismard defense team had been "gagged" by Judge Appleby; he stated that Judge Appleby was asking prospective jurors self-serving questions which he said were leading to "the creation of a hangman's court" and he stated that "it will be a kangeroo [*sic*] court unless the judge recluses [*sic*] himself" and that a kangeroo [*sic*] court means a guilty verdict.

The Committee asserted that the respondent had violated *DR* 1–102(A)(5) and *DR* 7–107(D).

The attorney investigating the matter for the Committee had requested that Hinds confer with him to offer any information or explanation which might assist the Committee in determining whether to proceed. *See R.* 1:20–2(h) and (k). Hinds refused. The Committee subsequently instituted formal proceedings by approving the charge recited above.

The Committee has never been permitted to hold a hearing. There is no record. The Court certified this case to consider the constitutional challenges to *DR* 1–102(A)(5) and *DR* 7–107(D). I submit we erred in doing so.[1]

It is an established principle that a court should, whenever feasible, decide a case on nonconstitutional grounds. That feasibility exists here. The parties sharply contested whether the respondent was "associated with the . . . defense," a condition precedent to violation of *DR* 7–107(D). If the respondent prevailed in this respect that charge would have been dismissed.

---

[1]Our certification requested respondent Hinds to brief the question of whether further factual findings were necessary. His brief argued none were needed because the Disciplinary Rules were facially unconstitutional and because there was a record in the United States District Court. The brief filed by the Ethics and Professional Services took the position that the Court could consider the facial constitutional issue and, if *DR* 1–102(A)(5) and *DR* 7–107(D) were found to be constitutional, the matter should be remanded to the District Ethics Committee.

Moreover, that finding could have had an effect on the propriety of the charge under *DR* 1–102(A)(5) concerning conduct prejudicial to the administration of justice. Thus it was possible that the entire controversy may have been decided without reaching the constitutional issues.

I agree with the majority that *DR* 7–107(D) is constitutional. The Rule bears repeating:

> During the selection of a jury or the trial of a criminal matter, the lawyer or a law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extra-judicial statement that he expects to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case.

The policy underlying this Disciplinary Rule is that the defendant and the State are entitled to and should have a fair trial. The attorney's right to speak is not completely prohibited. He may make appropriate argument in the courtroom. *See State v. Van Duyne*, 43 *N.J.* 369, 389 (1964), *cert.* denied, 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.2d* 279 (1965). He may after the case has been completed properly comment on the matter. What he may not do is intentionally disseminate to the public statements relating to the trial which are "reasonably likely to interfere with a fair trial."

The majority contends that the charge should be dismissed for two reasons, neither of which is valid. First it claims that its interpretation of *DR* 7–107(D) involves some new concept. I submit that application of the stated test—reasonably likely to interfere with a fair trial—does not involve any new or unforeseen dogma. The so-called "balancing test" referred to by the majority, *ante* at 626, is nothing more than the usual weighing which any fact finder must do when evaluating facts to reach a conclusion. Nor do I foresee any unfairness to the respondent. The Rule was written "by and for lawyers." *In re Keiler*, 380 *A.* 2d 119, 126 (D.C.1977). As stated in that case: "The language of a rule setting guidelines for members of the bar need not meet the precise standards of clarity that might be required of rules of conduct for laymen." *Id.* at 126.

· The second reason advanced is even more curious. It is that the charge should be dismissed because the factual dispute concerning the respondent's relationship to the defendant has never been resolved. Thus the respondent has successfully evaded a hearing to resolve whether he was "associated with the . . . defense" by instituting a constitutional attack—which the Court finds is unsuccessful.[2]

Lastly, I disagree with the majority's opinion that it seems quite certain that the First Amendment would require application of a "clear and present danger" standard to conduct under *DR* 1–102(A)(5). That rule reads as follows:

DR 1-102 Misconduct

(A) A lawyer shall not:

. . . .

(5) engage in conduct that *is* prejudicial to the administration of justice. [Emphasis added.]

This Disciplinary Rule on its face requires that the conduct must be shown to be prejudicial. There must be clear and convincing evidence that the attorney's conduct did in fact hinder, block or obstruct the administration of justice. I envisage no constitutional impediment to that standard. Assuredly attorneys whether directly related or not to an ongoing trial should not be permitted to frustrate a fair trial. *See Sheppard v. Maxwell*, 384 *U.S.* 333, 363, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.2d* 600, 620 (1966). In truth it is conceivable that an attorney who is not associated with the defense may have such standing in the community that his words may have a substantially greater impact on the fairness of a trial than those of the attorney of record.[3] This is

---

2I also do not.agree with the Court's very restrictive definition of what "associated with" means. It has limited the concept to any attorney who (1) cooperates with the defendant on a regular and continuing basis, (2) provides legal assistance *and* (3) holds himself out to be a member of the defense team. *Ante* at 627. An attorney could escape the effect of the rule by eliminating any one condition.

3The majority opines that an attorney not professionally connected with a pending criminal case "would seemingly enjoy the same free speech rights as

not to say that attorneys may not criticize courts, judges, their decisions, and the judicial system. There is a proper time and place for such criticism.

We shall not know whether the respondent's conduct was "prejudicial to the administration of justice or whether respondent was associated with the defense and violated *DR* 7–107(D)" due to the improper aborting of this proceeding. Innovative arguments advanced in support of the contention that a rule has not been violated may at times be relevant in determining the

---

any other citizen." *Ante* at 633. The majority relies on four decisions in support of this proposition. Two are not apropos. *Koenigsberg v. State Bar of California*, 353 *U.S.* 252, 77 *S.Ct.* 722, 1 *L.Ed.*2d 810 (1957), related to the rejection of plaintiff as an applicant for the bar because of his refusal to answer questions as to membership in the Communist Party. *In the Matter of R.J.M.*, —— *U.S.* ——, 102 *S.Ct.* 929, 71 *L.Ed.*2d 64 (1982), concerned the validity of a rule of the Missouri Supreme Court regulating advertising by attorneys. The issue was whether the advertising was misleading or whether there was any other justification for its regulation. There was no discussion or consideration of the issue involved in this case—the impact on an ongoing trial. The third, *Hirschkop v. Snead*, 594 *F.*2d 356 (4th Cir. 1979), held that lawyers are officers of the court subject to disciplinary sanctions to which non-lawyers are not subject, that they have First Amendment rights of free speech, but that they also have many privileges not enjoyed by others, and that with these privileges come responsibilities including compliance with codes of professional conduct. The fourth case, *Polk v. State Bar of Texas*, 374 *F.Supp.* 784, 788 (N.D.Tex.1974), is a district court case which assumes there is a very limited scope of areas in which attorneys' standards may be prescribed: (1) inability to represent clients competently and honestly and (2) direct interference with an ongoing trial.

Moreover, *DR* 1–102(A)(5) applies to an attorney who is acting as a member of the bar and not as an ordinary citizen, as the majority states. *Ante* at 634. The majority overlooks its previous statement that attorneys in their capacity as judicial officers "differ from ordinary citizens." *Ante* at 616. Justice Brennan observed in *In re Sawyer*, 360 *U.S.* 622, 636, 79 *S.Ct.* 1376, 1383, 3 *L.Ed.*2d 1473, 1483 (1959):

A lawyer does not acquire any license to do these things [criticisms of a judge's integrity] by not being presently engaged in a case. They are equally serious whether he currently is engaged in litigation before the judge or not. We can conceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, other than that they might tend to obstruct the administration of justice.

sanction to be applied. However, they should not serve as vehicles to evade due disciplinary proceedings. I would remand the matter to the District VIII Ethics Committee to process the complaint and proceed pursuant to *R.* 1:20–2.