IN THE MATTER OF THE PETITION OF GLORIA E. SOTO FOR
A DECLARATORY RULING AS TO THE APPLICABILITY OF
N.J.S.A. 5:12–138 TO CERTAIN POLITICAL ACTIVITIES.

GLORIA E. SOTO, PLAINTIFF–APPELLANT, v. STATE OF NEW
JERSEY, NEW JERSEY CASINO CONTROL COMMISSION
AND DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVI-
SION OF GAMING ENFORCEMENT, DEFENDANTS–RESPON-
DENTS.

Superior Court of New Jersey
Appellate Division

Argued October 31, 1988—Decided October 23, 1989.

304

Before Judges J.H. COLEMAN, DEIGHAN and BAIME.

*Edward N. Fitzpatrick* argued the cause for appellant (*Clapp & Eisenberg*, attorneys; *Edward N. Fitzpatrick*, of counsel; *Frederic S. Kessler* and *Harvey C. Kaish* on the brief; *Frederic S. Kessler* on the reply brief).

*Gary A. Ehrlich*, Deputy Attorney General, argued the cause for respondent Division of Gaming Enforcement (*Cary Edwards*, Attorney General of New Jersey, attorney; *Anthony J. Parrillo*, Assistant Attorney General, of counsel; *Gary A. Ehrlich* on the brief).

*Robert J. Genatt* argued the cause for respondent New Jersey Casino Control Commission (*Robert J. Genatt*, General Counsel, of counsel and on the brief with *Mark Neary*, Assistant Counsel).

The opinion of the court was delivered by

**DEIGHAN, J.A.D.**

This case presents a difficult question concerning casino employee regulations which may infringe upon constitutional rights. Plaintiff Gloria E. Soto, an attorney and also a casino key employee, challenges statutory restrictions contained in *N.J.S.A.* 5:12–138 (§ 138) which prohibit a casino officer or key employee from contributing any "money or thing of value" to a candidate for public office or any party or group organized to support such candidates.

Plaintiff had requested a ruling from the Casino Control Commission, which ruled that plaintiff could continue certain voluntary political activities but could not provide free legal services to any political organization or candidate. Plaintiff also filed a declaratory judgment action in the Chancery Division challenging the constitutionality of the act. Judge Gibson, in an oral opinion, found the statute in question to be constitutional. Both matters have been consolidated for purposes of this appeal.

Based on our thorough review of the record we affirm.

The facts are not in dispute. In 1985 plaintiff was selected by the New Jersey Democratic Party to serve as a member of its Platform Resolutions Committee (Platform Committee). At the time, plaintiff was employed by Trump Casino Hotel as its associate general counsel. Plaintiff had previously been designated a casino key employee by the Casino Control Commission (Commission) and had been granted the requisite license.

At the time of her assignment to the Platform Committee, plaintiff was aware of the provisions of § 138. On July 11, 1985, plaintiff informed the Commission of her assignment and requested a ruling as to whether the restrictions contained in § 138 would prohibit her service on the Platform Committee.

In the interim, plaintiff became employed by the Claridge Casino Hotel as the Director of Regulatory Affairs. Plaintiff was also required to be licensed as a casino key employee for this position. The Claridge Board of Directors subsequently

appointed plaintiff to the office of Vice President for Compliance and Legal Affairs. As a vice president, plaintiff is both a key employee and an officer of the Claridge.

On September 3, 1985 plaintiff requested that her application for a declaratory ruling be expanded to include a ruling on whether her personal participation in a committee of a state political party is a contribution of a "thing of value" within the proscriptions of § 138. On September 10, 1985, the Commission informed plaintiff that, as requested, the scope of the hearings would be expanded. She was also informed of the need for "more facts concerning the activities covered by [her] request."

Plaintiff did not submit the information requested by the Commission; instead, on November 4, 1986, she filed an amended petition which sought a ruling from the Commission that § 138 violated the United States Constitution. On November 17, 1986, the Commission advised plaintiff that it lacked the jurisdiction and authority to entertain or resolve constitutional challenges to its enabling statutes. The Commission also advised plaintiff that it did not have sufficient facts upon which to make a ruling on plaintiff's initial application and again requested further information. Plaintiff did not respond to the Commission's request; instead, her attorney informed the Commission that plaintiff intended to file a declaratory judgment action in the Superior Court concerning the constitutionality of § 138 and requested an indefinite adjournment pending the disposition of the court action.

On January 20, 1987, plaintiff filed a complaint in the Superior Court, Chancery Division, seeking a declaratory judgment that § 138 was unconstitutional in that it interfered with her rights of free speech and association. She also asserted that the phrase "thing of value" rendered the statute fatally vague and overbroad. Plaintiff further contended that the statute discriminated against casino key employees in violation of the

Equal Protection clause of the Fourteenth Amendment of the United States Constitution.

The Division of Gaming Enforcement (Division) and the Commission filed answers and then moved to dismiss the complaint or for summary judgment. After a hearing, Judge Gibson, on June 8, 1987, referred the case back to the Commission and ordered the Commission to determine the scope and definition of the phrase "thing of value" as it applied to plaintiff's proposed activities. The order also denied both defendants' motions without prejudice. Judge Gibson retained jurisdiction of the constitutional issues presented by plaintiff.

On June 9, 1987, plaintiff sent a letter to the Commission to amend her November 1986 petition to include rulings on the specific types of political activities in which she intended to engage. Plaintiff indicated that she planned to participate in: (1) the Platform Resolutions Committee of the New Jersey Democratic Party; (2) the New Jersey Hispanic Democrats; (3) the "Committee of 200," and (4) the Affirmative Action Committee of the New Jersey Democratic Party. She described the purpose and function of each of the organizations and the extent and nature of her proposed activity.

Following a hearing on July 8, 1987, the Commission analyzed § 138 and ruled that:

(1) Plaintiff could serve on the Platform Resolutions Committee of the New Jersey Democratic Party since she would "not be required to provide any professional legal services" as a result of her membership.

(2) Plaintiff could join the New Jersey Hispanic Democrats and could provide services incidental to her membership so long as those services did not constitute money or a "thing of value." The Commission found that plaintiff's offer of free legal service to this organization would constitute a thing of value and therefore would be in direct violation of § 138.

(3) Plaintiff was barred from joining the Committee of 200, since the annual membership fee of $1,000 clearly violated § 138.

(4) Plaintiff could serve on the Affirmative Action Committee of the New Jersey Democratic Party, since it "would involve only such personal services as are necessary for the Petitioner to express her views and to advocate minority representation."

The Commission and the Division then renewed their motions to dismiss or for summary judgment before Judge Gibson. On October 13, 1987, Judge Gibson delivered an oral opinion in which he found § 138 to be constitutional and granted the defendants' motion to dismiss the complaint. In reaching his decision, Judge Gibson made, among others, the following findings:

In particular, with respect to the Casino Control Act, it is this Court's conclusion that although the limitation with respect to First Amendment freedoms has been demonstrated, *the type of limitation here is of the marginal type referred to by the Supreme Court in Buckley.*[1] By that I mean that there is no limitation under this statute to Gloria Soto's ability to speak out on public issues. There is no limit on her ability to support, through her expression of views, a particular candidate, there is no limit on her ability to join and participate in a political party. Her freedom to speak, her freedom to associate in those senses have not been impacted upon by Section 138. The impact is a more limited kind.

 \* \* \* \* \* \* \* \*

On the question of whether there has been a showing of a sufficiently compelling State interest in this case, I'm satisfied that there has been. *As the history of this State's public policy towards casino gambling reflects, there has been a longstanding and strong sensitivity to the evils traditionally associated with casino gambling when it is unregulated, and even when there is regulation, there is a continued sensitivity to the maintenance of the integrity of the process, and in particular, the regulatory process.*

As I pointed out earlier, when casino gambling was legalized here in New Jersey, it was only on the condition that it be strictly regulated and that the regulation that came out of it extended not only to the casinos but to the people who ran the casinos.

 \* \* \* \* \* \* \* \*

The Legislature recognized when it passed the Casino Control Act the limitation that the constitutional amendment carried with it and *the Legislature recognized the concentration of wealth that exists with casinos and the disproportionate weight of that wealth, and how the casinos as a group or individually can bring that to the political process. The Legislature recognized the need for maintaining the integrity of the regulatory process,* not in just some abstract way, but because the acceptability of casino gambling in the State depends on strict regulation.

An equally important fact in that process is maintaining not just the actual integrity of the regulations but the appearance of the integrity that is needed

---

[1]*Buckley v. Valeo,* 424 *U.S.* 1, 96 *S.Ct.* 612, 46 *L.Ed.*2d 659 (1976).

because it is with that that the public confidence will continue and how the predicate to the legalization to gambling will exist.

\* \* \* \* \* \* \* \*

Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the Constitution itself. As expressed in the Casino Control Act, which implements the Constitution's gambling clause, *it is the pronounced policy of the State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained.* [Emphasis added.]

On October 26, 1987, Judge Gibson entered an order dismissing the complaint. Plaintiff appealed both Judge Gibson's decision and the Commission's ruling. We consolidated the appeals.

On appeal plaintiff raises the following issues: (1) a blanket prohibition of political contributions is unconstitutional; (2) the term "thing of value" should not be defined to include voluntary professional services; (3) the Commission's definition of "thing of value" renders the statute unconstitutionally vague, and (4) § 138 invidiously discriminates against plaintiff and other casino employees in violation of their right to equal protection.

## I

Before embarking upon a discussion of the issues involved, it might be well to discuss the right to engage in political activity, as that right is protected by the First Amendment of the United States Constitution. To begin with, "[i]t goes without saying that our system of government is predicated upon the premise that every citizen shall have the right to engage in political activity. It is a basic freedom enshrined in the First Amendment." *In re Gaulkin*, 69 *N.J.* 185, 191 (1976) (citing *Sweezy v. New Hampshire*, 354 *U.S.* 234, 250–251, 77 *S.Ct.* 1203, 1212, 1 *L.Ed.*2d 1311, 1325 (1957) reh. den. 355 *U.S.* 852, 78 *S.Ct.* 7, 2 *L.Ed.*2d 61 (1957); *De Jonge v. Oregon*, 299 *U.S.* 353, 364, 57 *S.Ct.* 255, 260, 81 *L.Ed.* 278, 283–284 (1937)). Political speech occupies a preferred position in our system of

constitutionally-protected interests. *See Murdock v. Pennsylvania*, 319 *U.S.* 105, 115, 63 *S.Ct.* 870, 876, 87 *L.Ed.* 1292, 1300 (1943); *State v. Miller*, 83 *N.J.* 402, 411 (1980). The First Amendment affords the broadest protection to political expression, *Buckley v. Valeo*, 424 *U.S.* 1, 14, 96 *S.Ct.* 612, 632, 46 *L.Ed.*2d 659, 685 (1976), and protects political association as well. *Id.* at 15, 96 *S.Ct.* at 632, 46 *L.Ed.*2d at 685.

State action that withholds a privilege from an individual who has engaged in a protected association infringes on the constitutionally protected interest of freedom of association which, like free speech, lies at the foundation of a free society. *In re Martin*, 90 *N.J.* 295, 325–26 (1982). Once it is determined that a state action may have the effect of curtailing the freedom to associate, the action is subject to the closest scrutiny. *Id.* at 326. A constitutional interest may be impeded by the state only if the state has a conflicting interest sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right. *NAACP v. Alabama*, 357 *U.S.* 449, 463, 78 *S.Ct.* 1163, 1172, 2 *L.Ed.*2d 1488, 1500 (1958). The interest must be compelling. *Ibid.*

Even when the state interest is sufficiently compelling to justify the governmental limitation on constitutional rights, the intrusion must be accomplished in the least restrictive manner possible. *See Nixon v. Adm. of General Services*, 433 *U.S.* 425, 467, 97 *S.Ct.* 2777, 2802, 53 *L.Ed.*2d 867, 906 (1977). Thus, any state interference with protected interests is permitted only if the state can demonstrate both that it possesses a sufficiently important interest and that the means chosen to achieve that interest are "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo*, 424 *U.S.* at 25, 96 *S.Ct.* at 637, 46 *L.Ed.*2d at 691; *Martin*, 90 *N.J.* at 327. Moreover, a state statute which restricts freedom of speech must be neither vague nor overbroad. *In re Hinds*, 90 *N.J.* 604, 617–618 (1982); *accord In re Rachmiel*, 90 *N.J.* 646, 655 (1982).

An analysis of fundamental rights under our State Constitution differs from the analysis of those rights under the United States Constitution. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 567 (1985). New Jersey has developed a balancing test which is used in analyzing claims based on Article 1, Paragraph 1 of our State Constitution. *Ibid.* In applying this test, our courts have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon the right and the public need for the restriction. *Ibid.* Our courts continue to look to both the federal courts and other state courts for assistance in constitutional analysis. *Id.* at 568.

In summary, in order to evaluate whether § 138 infringes upon plaintiff's First Amendment rights, we must determine whether there is a compelling state interest to justify the infringement on fundamental rights. If so, we must then determine whether the legislative restriction is sufficiently narrow and rationally related to the interest. In order to determine whether the statute is either overbroad or vague, it is necessary to examine the purpose and need for the legislation, as well as the status of the casino industry in New Jersey.

## II

Plaintiff's initial contention is that "[a] blanket prohibition of political contributions is unconstitutional." She argues that "[w]hile limitations upon political contributions by individuals have been held permissible," citing *Buckley v. Valeo*, "there is no legitimate basis for prohibiting such contributions entirely."

Plaintiff maintains that a blanket prohibition on political contributions by casino employees is an impermissible infringement upon her First Amendment right of free speech. She contends that the trial court "erred by concluding that 'the type of limitation here is of the marginal type referred to in *Buckley*'." Plaintiff then argues that "as long as the individual is allowed to engage in the 'general expression of support' which a contribution represents, the quantity of the contribution is

less important. A limitation 'permits the symbolic expression of support evidenced by a contribution,' *but a total prohibition does not."* (Emphasis in original.)

*Buckley v. Valeo,* involved a series of challenges to the Federal Election Campaign Act of 1971, which established the system of public financing for Presidential election campaigns. One of the challenged statutes, 18 *U.S.C.* § 608(b)(1) (now 2 *U.S.C.* § 441(a)(1)(A)) established a $1,000 limit on political contributions by individuals or groups to any single candidate for a federal elective office. *See* 424 *U.S.* at 189, 96 *S.Ct.* at 713, 46 *L.Ed.*2d at 783.

In addressing the challenge to the statute, the Court first outlined the protections offered to political activity under the First Amendment. The Court observed that "[t]he Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.... The First Amendment affords the broadest protection to such political expression." 424 *U.S.* at 14, 96 *S.Ct.* at 632, 46 *L.Ed.*2d at 685. The Court also noted that the First Amendment protects political association as well as political expression. 424 *U.S.* at 15, 96 *S.Ct.* at 632, 46 *L.Ed.*2d at 685.

The Court contrasted the limitation on contributions with limitations on expenditures, finding the latter to represent substantial "restraints on the quantity and diversity of political speech." 424 *U.S.* at 19, 96 *S.Ct.* at 635, 46 *L.Ed.*2d at 688. In noting the differences between the two, the Court explained why the limitation on contributions was not violative of the First Amendment:

By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.

A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, *symbolic* act of contributing.... A limitation on the amount

of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the *symbolic* expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. [424 *U.S.* at 20–21, 96 *S.Ct.* at 635–636, 46 *L.Ed.*2d at 688–689 (emphasis added).]

The Court tempered the First Amendment right to political association and stated that "[e]ven a 'significant interference' with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 *S.Ct.* at 637, 46 *L.Ed.*2d at 691 (citations omitted). *See also California Medical Ass'n v. Federal Election Comm'n,* 453 *U.S.* 182, 196 n. 16, 101 *S.Ct.* 2712, 2722 n. 16, 69 *L.Ed.*2d 567, 580 n. 16 (1981) (Political contributions are an "attenuated form of speech [which do] not resemble the direct political advocacy to which [the Court] in *Buckley* accorded substantial constitutional protection.") The Court then held that the governmental interest in preventing the corruption, or appearance of corruption, which could accompany unlimited financial contributions justified the restrictions on contributions. 424 *U.S.* at 25–29, 96 *S.Ct.* at 637–640, 46 *L.Ed.*2d at 691–694.

The need for the type of restriction embodied in § 138 was identified by the State Commission of Investigation (SCI) in its April 1977 report to the Governor and Legislature, entitled *Report and Recommendations on Casino Gambling.* The report noted that,

contributions by casino licensees, both corporate and individual, give the *appearance* of attempting to "buy" political influence and favoritism and in fact have the very real potential for causing such favoritism to occur.... The State Commission of Investigation is inclined to recommend[ ] an absolute prohibition against any licensee of the state regulatory authority, whether it be an individual, corporation or so-called "holding company[,]" from making a contribution to any political candidate, party or campaign organization within this State, either directly or indirectly. [State Commission of Investigation, *Report and Recommendations on Casino Gambling* 4–I—5–I (1977).]

The report acknowledged the United States Supreme Court decision in *Buckley v. Valeo* and expressed concern that "an absolute prohibition may raise serious constitutional questions."

*Id.* at 5–I. Nevertheless, the SCI report suggested flat prohibitions against political contributions by casino employees:

> Accordingly, the S.C.I. recommends that at the very least, the Legislature should impose strict limitations on the amounts licensees could contribute to political activities It further suggests that the Legislature closely examine this issue to determine whether flat prohibitions would be permissible. [*Id.* at 6–I.]

Thus, the same fear of corruption of the political process relied upon by the Supreme Court in *Buckley* is equally present in this case. This fear of political corruption, or even the appearance of it, runs throughout the report by the SCI and is reflected in the statutory and regulatory framework which governs every aspect of casino operations.

The need for this scope of statutory and regulatory coverage was summarized by Justice Handler in *Knight v. Margate*, 86 *N.J.* 374 (1981):

> Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the Constitution itself. *N.J. Const.* (1947), Art IV, § 7, par. 2.[2] As expressed in the Casino Control Act, which implements the Constitution's gambling clause, it is the pronounced policy of this State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained. [86 *N.J.* at 392 (citation omitted) (footnote added).]

*Accord, Greenberg,* 99 *N.J.* at 560–61; *see In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* 324, 341–42 (App.Div.1981), aff'd. as mod. 90 *N.J.* 361 (1982) app. dism. 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927 (1982). As our Supreme Court has stated, our courts are "concerned not only with impropriety, but also with its appearance, which is always more subtle than impropriety itself." *Greenberg* 99 *N.J.* at 561.

In order to fully understand the concern we have here, it is important to note the relationship between the governmental process and political parties. A "political party" may be gener-

---

[2]The genesis of our casino industry was an amendment to *N.J. Const.* (1947), art. 4, § 7, ¶ 2 which was authorized by a referendum in 1976.

ally defined as an unincorporated association of persons which sponsors certain ideas of government or maintains certain political principles or beliefs in the public policies of the government. It is formed for the purpose of urging the adoption and execution of such principles in governmental affairs through officers of like beliefs. *Rogers, et al v. State Com. of Republican Party, et al,* 96 *N.J.Super.* 265, 271 (Law Div.1967); 25 *Am.Jur.*2d, *Elections,* § 116 at 800.

■ Political parties are institutions of very great importance under our form of government. They are, in fact, the effective instrumentalities by which the will of the people may be made vocal, and the enactment of laws in accordance therewith made possible. So potent have they become in administering the affairs of government that they are now regarded as inseparable from, if not essential to, a republican form of government, *Rogers* 96 *N.J.Super.* at 271, and as a necessary adjunct to representative government. *Wene v. Meyner,* 13 *N.J.* 185, 193 (1953). They are imbued with a quasi-governmental character. *Tribe, American Constitutional Law,* § 13–23 at 1118 (2 ed. 1988).

Political parties have come to be regarded by the courts as governmental agencies through which the sovereign power is exercised by the people. The conception that a political party is merely a private association of citizens has been generally abandoned. In most jurisdictions the state has seen fit to declare that political parties shall be, as to their mode of holding conventions and nominating candidates for public office, regarded as public bodies whose methods are to be controlled by the state. 25 *Am.Jur. supra,* at 801–802. *See also, Tribe, supra,* § 13–23 at 1121.

The compelling state interest in maintaining the integrity of political parties and organizations from undue influence by those individuals who, by the very nature of their employment, play a pivotal role in the casino industry justifies upholding the restrictions found in § 138.

## III

In challenging the validity of § 138, plaintiff argues that a limitation on contributions, rather than an outright prohibition, should be the method utilized to regulate the political activity of casino key employees. In effect, this requires a determination as to whether there is available a less restrictive means of regulation which would achieve the State's interest in preventing the appearance or occurrence of political corruption.

As pointed out by the United States Supreme Court, we will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC v. National Right to Work Committee*, 459 *U.S.* 197, 210, 103 *S.Ct.* 552, 561, 74 *L.Ed.*2d 364, 377 (1982). As stated in *Federal Election Commission v. National Conservative Political Action Comm.*, 470 *U.S.* 480, 497, 105 *S.Ct.* 1459, 1468, 84 *L.Ed.*2d 455, 470 (1985):

> Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo:* dollars for political favors.

"[D]ispelling the *appearance* of such illicit impact on [elected officials] from their large ... contributors is of almost equal concern." *Tribe, supra,* § 13–28 at 1137 (citing *Buckley,* 424 *U.S.* at 27, 96 *S.Ct.* at 638).

Given the acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it, *Greenberg,* 99 *N.J.* at 574, there is no viable alternative available to prevent the appearance of, or actual, corruption of the political process in New Jersey. As noted by Justice Pollock in *Greenberg* "[a] public perception that any improper influence has infiltrated the [regulatory and judicial] processes, however slightly, would undermine the trust that is essential to continued confidence in the industry and, what is more important, in state government." *Ibid.*

This type of prohibition was upheld by the Illinois Supreme Court in *Schiller Park Colonial Inn, Inc. v. Berz*, 63 *Ill.*2d 499, 349 *N.E.*2d 61 (1976) (*Schiller Park*), which was decided after *Buckley v. Valeo*. In *Schiller Park* a group of liquor licensees challenged the constitutionality of a state statute which made it unlawful for any liquor licensee—or officer, associate, agent, representative or employee of a liquor licensee—to contribute directly or indirectly to a political party or candidate. *Ill.Rev. Stat.* 1973, ch. 43, para. 132. The Supreme Court of Illinois held that in view of the substantial state interest involved, and the fact that the statute imposed relatively minor limitations upon licensees' constitutional rights, the statute did not violate rights of free speech or association; nor did it violate the licensees' right to due process or equal protection. 349 *N.E.*2d at 67–68.

In upholding this statute on federal and state constitutional law grounds, the Illinois Supreme Court stated that:

> The General Assembly may reasonably have believed, however, that its efforts to further the relevant State interests would have been much less effective if only contributions above a certain amount were prohibited.... We therefore hold that section 12a is not rendered unconstitutional by the fact that it prohibits small political contributions as well as large contributions. [*Id.* at 66.]

The Court held that the Legislature's decision to prohibit contribution by liquor licensees to political parties as well as to individual candidates was not overly broad, stating:

> A political party, a local party organization or individuals who participate in policy making within a party organization may have influence or power which could be used to affect various actions concerning the liquor industry. [*Ibid.*]

In upholding the prohibition of contributions to all candidates, and not merely those whose potential duties have some relationship to the regulation of liquor, the court concluded:

> The nature of our political system and past history suggest that political officials or public officers may wield powers or possess influence beyond the powers and influence inherent in their official duties. In attempting to prevent liquor licensees from obtaining influence in the area of liquor regulation, therefore, the legislature acted reasonably in proscribing the giving of campaign contributions by liquor licensees to any candidate. [*Id.* at 67.]

The concerns expressed by the court in *Schiller Park* are equally applicable to casino gaming and the potential influence it could wield in state and local government.[3]

## IV

Plaintiff contends that § 138 "is overbroad insofar as it prohibits contributions to any and every political candidate and committee in this State, regardless of whether the particular office or committee has anything to do with casino regulation. The statute, by its terms extends even to county and local offices outside of Atlantic City." She also contends that the term "thing of value" in § 138 is unconstitutionally vague and that the term should not be defined to include voluntary professional services. She argues that "it is clear that when the Legislature defined the term 'thing of value' in relation to political contributions, it chose not to include voluntary personal services."

We disagree.

The concepts of vagueness and overbreadth as applied to constitutionally permissive limits are somewhat similar, yet there are important distinctions to be made between them. *In re Hinds*, 90 *N.J.* at 617. A prohibition upon speech may be

---

[3]The parallel between the liquor, horse racing and casino industries was noted by Judge Fritz in *In re Boardwalk Regency Casino License Application:*

There is nothing inherently wrong with sensitive, strict regulation. It has for many years been exercised in this State in certain industries. Liquor, with "its inherent evils," has been dealt with as "a subject apart." *Grand Union Co. v. Sills*, 43 *N.J.* 390, 398 (1964). The legislative power to regulate such a "nonessential and inherently dangerous commodity," as a wholly constitutional expression of concern for public health, safety, morals or general welfare, has been said to be almost without limit. *Id.* at 403–404. Horse racing, with attendant legalized gambling, "strongly affected by a public interest," has been held to be a "highly appropriate" subject for close regulatory supervision, *Niglio v. N.J. Racing Comm'n.* 158 *N.J.Super.* 182, 188 (App.Div. (1978). We see every reason, including those expressed in *N.J.S.A.* 5:12-1b, for legalized casino gaming to take its deserved place among those industries. [180 *N.J.Super.* at 341.]

void for vagueness if it is not clearly defined. *Ibid.* The "void for vagueness" doctrine involves procedural due process considerations of fair notice and adequate warning. *Id.* at 618.

Prohibitions upon speech can also be void if they are broad and far reaching in scope—when "in [their] reach [they] prohibit[ ] constitutionally protected conduct." *Ibid.* (citing *Grayned v. City of Rockford*, 408 *U.S.* 104, 114, 92 *S.Ct.* 2294, 2302, 33 *L.Ed.*2d 222, 231 (1972)). Overbreadth involves substantive due process considerations concerning excessive governmental intrusion into protected areas. *Id.* 90 N.J. at 618.

Dealing first with the overbreath doctrine, in order to mount a successful overbreadth challenge there must be a strong showing that the statute's deterrent effect on legitimate expression is real and substantial. *N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm.*, 82 *N.J.* 57, 66 (1980). The prospect of first amendment harm must be real, not fanciful. *Anderson v. Sills*, 56 *N.J.* 210, 220 (1970); *accord N.J. Chamber of Commerce*, 82 *N.J.* at 66.

In determining whether a statute is overbroad, the question is whether the enactment reaches a substantial amount of constitutionally protected conduct. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 494, 102 *S.Ct.* 1186, 1191, 71 *L.Ed.*2d 362, 369 (1982), reh'g denied 456 *U.S.* 950, 102 *S.Ct.* 2023, 72 *L.Ed.*2d 476 (1982). The standard is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far in fulfilling the state's interest. *Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 125 n. 21 (1983).

We are satisfied that § 138 has been narrowly drawn and precisely tailored to serve the compelling interest of the State. § 138 is applicable only to casino key employees, who are defined as persons in a supervisory capacity or empowered to make discretionary decisions which regulate casino opera-

tions. *N.J.S.A.* 5:12–9.[4] Such a select prohibition is more than justified by the overriding interest in protecting the governmental process from the infiltration of the casino influence. As previously noted, we should not "second-guess" the Legislature's judgment. *See FEC v. National Right to Work Committee,* 459 *U.S.* at 210, 103 *S.Ct.* at 561, 74 *L.Ed.*2d at 377.

Nor do we find the statute overbroad because it prohibits contributions to any political candidate and committee within the State regardless of whether the particular office or committee has anything to do with casino regulation. This argument was answered in *Schiller Park,* where the Illinois Court stated that "[i]t is difficult and probably impossible to determine precisely which officeholders will be in a position to exercise influence in the area of liquor regulation." 63 *Ill.*2d at 510, 349 *N.E.*2d at 67. As noted above, the *Shiller Park* court observed that "[t]he nature of our political system and past history suggests that political officials or public officers may wield powers or possess influence beyond the powers and influence inherent in their official duties." *Ibid.*

▮ Plaintiff's reliance on *N.J.S.A.* 52:13D–17.2 to buttress her argument that § 138 is overbroad is misplaced. That statute, as amended in 1981, prohibits virtually all state officers, employees and immediate family members from securing employment in the casino industry. Only certain local government offices were not included in the statute's broad coverage. *See N.J.S.A.* 52:13D–17.2(a). Clearly, § 138 was designed to prevent political corruption or its appearance; since the statute applies to all governmental offices which could come in contact with the casino industry, it works toward the same goal as *N.J.S.A.* 52:13D–17.2.

---

[4] The Commission estimates the personnel within this classification number approximately 1450 as of April 1, 1987, which represents only 3.5% of all the employees of the casinos at that time. As of June, 1988, the Division placed the number of active casino key employee licensees at approximately 2200.

We are convinced that although there has been a showing that the statute's deterrent effect on legitimate expression is real and substantial, the sweep of the legislation will not impermissibly hovel the exercise of protected first amendment rights. *See N.J. Chamber of Commerce,* 82 *N.J.* at 66.

In regards to plaintiff's argument that the term "thing of value" should not be defined to include voluntary professional services, we note that the Commission made a distinction between personal services incidental to ordinary committee membership and professional services. The Commission ruled that:

> [T]here is no reason to believe that Section 138 was ever intended to reach participation for the purpose of expressing ideas and engaging in debate on issues or candidates. Such activities do not involve the transfer or provision of a tangibly valuable service or commodity which might invoke a sense of obligation to the contributor by a political candidate. If the Legislature had intended to prohibit membership in political organizations, it could have done so very simply. As noted by the Division in its letter response, nothing in Section 138 by its terms prevents the petitioner from being an active member of any political party or committee thereof.

The Commission then made a distinction between political participation and the contribution of professional services:

> An attorney's services are not valued based on the personal ideological beliefs of the attorney but rather on the legal expertise and professional advocacy skills which he or she possesses. Professional legal services, provided greatis [sic] by a committee member who is an attorney, can readily be replaced, at a price, by the professional services of another attorney. No distinction can validly be drawn between providing money to a political organization to pay for the professional services of an attorney, and providing professional legal [s]ervices directly without requiring payment for them.

The Commission ruled that plaintiff could join the New Jersey Hispanic Democrats and that her "personal non-professional service in the [organization] would not violate § 138 of the Act if such service can be rendered independently of any barred professional services." The Commission found that plaintiff's offer of free legal service to this organization would be in direct violation of § 138 as constituting a "thing of value." We agree with this finding.

## V

Plaintiff next argues that if the definition of a "thing of value" is to include "professional services" the statute is unconstitutionally vague. Plaintiff then concludes that:

The term "professional services" is susceptible to so many and varied definitions that "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma,* 413 *U.S.* 601, 607, 93 *S.Ct.* 2908 [2913], 37 *L.Ed.*2d 830 (1973); *Connally v. General Construction Co.* 269 *U.S.* 385, 391, 46 *S.Ct.* 126 [127], 70 *L.Ed.* 322 (1926). It fails to set out "explicit standards" for those who must apply it or provide "fair warning" to those to whom it applies. *See Grayned v. City of Rockford,* 408 *U.S.* 104, 108–109, 92 *S.Ct.* 2294 [2298–2299], 33 *L.Ed.*2d 222 (1972). The statute, as interpreted by the Commission, is therefore unconstitutionally vague.

A statute is void for vagueness if it is couched in terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 1688, 29 *L.Ed.*2d 214, 217 (1971); *accord State v. Lashinsky,* 81 *N.J.* 1, 17–18 (1979); *Matter of Hotel and Restaurant Emp. and Bartend.,* 203 *N.J.Super.* 297, 328 (App.Div.1985) certif. den. 102 *N.J.* 352 (1985). As long as procedural and judicial safeguards are available, however, the fact that certain statutory phrases are not "impeccable specimens of draftsmanship does not impugn their legality." *In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* at 345 (citation omitted).

In *Grayned v. City of Rockford,* 408 *U.S.* 104, 92 *S.Ct.* 2294, 33 *L.Ed.*2d 222 (1972), the Court reviewed the values that are offended by vague laws and determined that there is a two-fold purpose in requiring specific legislation. *See* 408 *U.S.* at 108, 92 *S.Ct.* at 2298, 33 *L.Ed.*2d at 227. The Court first held that laws must provide notice as to the conduct prescribed, so that people of ordinary intelligence have a reasonable opportunity to know what is prohibited and can act accordingly. *Ibid.* Secondly, the Court mandated that laws must provide explicit standards for those who apply them in order to avoid arbitrary and discriminatory enforcement. *Ibid.*

Vagueness is a matter of degree and context. We recognize that "there are limitations in the English language with respect to being both specific and manageably brief," *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 *U.S.* 548, 578–579, 93 *S.Ct.* 2880, 2897, 37 *L.Ed.*2d 796, 816 (1973), and that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 *U.S.* at 110, 92 *S.Ct.* at 2300, 33 *L.Ed.*2d at 228–229 (footnote omitted). Moreover, we recognize that there "are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." *Smith v. Goguen*, 415 *U.S.* 566, 581, 94 *S.Ct.* 1242, 1251, 39 *L.Ed.*2d 605, 616 (1974).

 The term "thing of value" is a very elastic phrase and is used in many settings. This is evidenced by the fact that in 41A *Words and Phrases* 212 (West 1965) there are 37 citations for the term "thing of value;" the 1988 supplement for this volume contains an additional 39 citations. In addition, a computer analysis revealed that this phrase appears in at least 42 New Jersey statutes.[5] Surely, a phrase with such flexible and common-place usage cannot be said to be vague in and of itself, but must be given a common-sense interpretation in context with the statute and the manner in which it is used.

---

[5]The phrase "thing of value" appears in the following statutes: *N.J.S.A.* 2A:23–4; *N.J.S.A.* 2C:29–4; *N.J.S.A.* 4:13–45; *N.J.S.A.* 5:1–1; *N.J.S.A.* 5:12–45; *N.J.S.A.* 5:12–125; *N.J.S.A.* 5:12–138; *N.J.S.A.* 8A:9–4; *N.J.S.A.* 10:5–5; *N.J.S.A.* 17:3B–5; *N.J.S.A.* 17:11A–46; *N.J.S.A.* 17:11B–14; *N.J.S.A.* 17:16C–70; *N.J.S.A.* 17:45–17; *N.J.S.A.* 17:48–15; *N.J.S.A.* 17:48A–22; *N.J.S.A.* 18A:14–89; *N.J.S.A.* 18A:14–90; *N.J.S.A.* 18A:18B–6; *N.J.S.A.* 18A:64A–25.38; *N.J.S.A.* 19:29–1; *N.J.S.A.* 19:34–25; *N.J.S.A.* 19:34–41; *N.J.S.A.* 19:34–45; *N.J.S.A.* 19:44A–3; *N.J.S.A.* 19:44A–11; *N.J.S.A.* 19:44A–20; *N.J.S.A.* 19:44A–29; *N.J.S.A.* 19:44B–1; *N.J.S.A.* 31:11D–94; *N.J.S.A.* 32:29–27; *N.J.S.A.* 34:1–1; *N.J.S.A.* 39:6A–15; *N.J.S.A.* 45:15–3; *N.J.S.A.* 46:15–5; *N.J.S.A.* 52:9Q–13; *N.J.S.A.* 52:13C–29; *N.J.S.A.* 52:13D–14; *N.J.S.A.* 52:13D–16; *N.J.S.A.* 52:13D–23; *N.J.S.A.* 52:13D–24 and *N.J.S.A.* 54:3–22.

As a New York court stated in *People v. Hochberg*, 87 *Misc.*2d 1024, 386 *N.Y.Supp.*2d 740, 746 (Sup.Ct. Albany Cty. 1976) aff'd 404 *N.Y.Supp.*2d 161, 62 *A.D.*2d 239 (N.Y.App.Div. 1978):

> It seems clear that the Legislature used these terms for the very purpose of extending the effect of the statute beyond the tangible items of money or property to the intangible rewards encompassed in phrases such as "thing of value" and "thing ... of personal advantage." Since the common meaning of these terms is well known and defined, their use when read in context with the rest of the statute does not make the statute unconstitutionally vague.

We hold that the term "thing of value" in § 138 of the Casino Control Act is not unconstitutionally vague.

## VI

Plaintiff next contends that the Commission's definition of "professional service" as a "thing of value" "raises more questions than it answers." Plaintiff conjures up a series of irrelevant hypothetical questions as strawmen to support her argument.

The term "professional services" is a generic term. It could apply to any number of professions and its application is determined on an *ad hoc* basis. For instance, in *Autotote Limited v. N.J. Sports & Exposition Authority*, 85 *N.J.* 363 (1981) the Supreme Court, relative to a bidding statute, described the integration of a sophisticated computer system and other services of such a technical and scientific nature as "professional services." *Id.* at 371. In *Burlington Tp. v. Middle Dep't. Inspection Agency*, 175 *N.J.Super.* 624 (Law Div.1980), the court was called upon to determine whether bidding was required for an electric inspection contract since under *N.J.S.A.* 40A:11–5(1)(a)(i) bidding is not required for professional services. The court held that electrical inspection and enforcement services are not professional services. *Id.* at 633. The court analyzed *N.J.S.A.* 40A:11–2(6), which defines "professional services," and noted that there were three components for qualification as a "professional service,": (1) the services are to be rendered or performed by a person autho-

rized by law to practice a recognized profession; (2) that person's practice is regulated by law and (3) the performance of the services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study, as distinguished from general academic instruction or apprenticeship and training. *Id.* at 630–631.

It is clear that the term "professional services" is an all-inclusive term which covers such professions as auditing, accounting, engineering and other disciplines. Thus, it would not be feasible to lay down standards or guidelines for every profession which may be involved in the casino industry.

Here, of course, we are concerned with plaintiff's profession as an attorney. "The practice of law is not subject to precise definition. It is not confined to litigation but instead often encompasses 'legal activities in many non-litigious fields which entail specialized knowledge and ability'." *Application of New Jersey Society of CPAs,* 102 *N.J.* 231, 236 (1986) (citations omitted). *New Jersey Bar Ass'n. v. Northern N.J. Mtge. Associates,* 32 *N.J.* 430, 437 (1960), accord, *N.J. State Bar Ass'n. v. N.J. Ass'n of Realty Bds.,* 93 *N.J.* 470, 473 supplemented 94 *N.J.* 449 (1983); *Auerbacher v. Wood,* 139 *N.J.Eq.* 599 (Ch.1947), aff'd 142 *N.J.Eq.* 484, 485 (E. & A.1948) (what constitutes the practice of law does not always lend itself to a precise description). As stated in *Rhode Island Bar Ass'n v. Lesser,* 68 *R.I.* 14, 26 *A.*2d 6 (1942), "the practice of law, though difficult to define precisely, [is] understood to embrace in general all advice to clients and all action taken for them in matters connected with the law." 26 *A.*2d at 7. *See also State Bar of Arizona v. Arizona Land Title & Trust Co.,* 90 *Ariz.* 76, 366 *P.*2d 1, 8–9, 14 (1961), mod. o.g. 91 *Ariz.* 293, 371 *P.*2d 1020 (1962) ("practice of law" may not be subject of exhaustive definition but consists of those acts, whether performed in court or law office, which lawyers customarily have carried on from day to day through centuries).

Here, plaintiff seeks to invalidate the Commission's ruling prohibiting her from performing "professional services" on the basis that the term is vague and therefore unconstitutional. In effect she seeks to have the undefinable specifically defined.

 As stated in *In re Suspension of DeMarco*, 83 *N.J.* 25 (1980), in connection with a statute regulating physicians:

> The question ultimately is one of fairness, given the statute and its provisions, and given the situation of the defendant. Should he have understood that his conduct was proscribed, should he have understood that the penalty about to be imposed was the sanction intended by the Legislature? The test is whether the statute gives a person of ordinary intelligence fair notice that his conduct is forbidden and punishable by certain penalties. That test, however, does not consist of a linguistic analysis conducted in a vacuum. It includes not simply the language of the provision itself, but related provisions as well, and especially the reality to which the provision is to be applied. The test here is whether a *physician* of ordinary intelligence would have understood, and would have been given fair notice by virtue of these provisions, that his conduct rendered him liable to a $200 penalty as to each patient. [*Id* at 37 (emphasis in original).]

*Accord, In re Boardwalk Regency Casino License Application*, 180 *N.J.Super.* at 346. Here the test is whether an *attorney* of ordinary intelligence would have understood, and therefore would have been given fair notice, that she was providing legal services gratuitously. We hold that the guidelines concerning the practice of law, though unspecified, sufficiently gave plaintiff fair notice of those activities which would be construed as legal services.

## VII

Lastly, plaintiff contends that her right to equal protection has been violated. She argues that by "singling out plaintiff and others in the casino industry [and prohibiting them from making contributions], the statute violates their right to equal protection" as guaranteed by the Fourteenth Amendment to the United States Constitution, as well as by the New Jersey Constitution. Simply stated, she contends that the Fourteenth Amendment "requires that all persons similarly situated be treated alike."

She notes that the liquor industry with its "inherent evils" has been dealt with as "a subject apart," citing *Grand Union Co. v. Sills*, 43 *N.J.* 390, 398 (1964) and that horse racing, which like casino gambling was authorized in this State by a constitutional amendment, is "strongly affected by a public interest" and is a "highly appropriate" subject for close regulatory supervision, citing *Niglio v. N.J. Racing Commission*, 158 *N.J.Super.* 182, 188 (App.Div.1978). She then argues that despite these characteristics, which are similar to characteristics of the casino industry, individuals in the liquor and horse racing business "are not prohibited from making political contributions. Plaintiff states that "casino gambling is not unique in any significant respect" and submits "that there is no 'compelling state interest' so unique to the casino industry as to permit casino employees to be singled out for disparate treatment and be deprived of their fundamental rights under the First Amendment."

These arguments are categorically rejected. It has been legislatively and judicially recognized that crime and corruption are inherent in the casino industry and that casino gambling is unique.

In *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.*2d 274 (1972) the Supreme Court set forth guidelines to determine whether the Equal Protection Clause has been violated:

> To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. [405 *U.S.* at 335, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 280 (citation omitted).]

As explained by the New Jersey Supreme Court, federal equal protection analysis involves different levels of review:

> If a fundamental right or suspect class is involved, the legislative classification is subject to strict scrutiny. To justify the restriction a state must establish that a compelling state interest supports the classification and that no less restrictive alternative is available. With other rights, however, the legislative

classification need only be rationally related to a legitimate interest. [*Greenberg*, 99 *N.J.* at 564 (citations omitted).]

The *Greenberg* Court further added:

The standard of review varies, furthermore, with the effect of the governmental regulation upon the affected right. When the effect on a right, even a right that is fundamental, is indirect or insubstantial, the Court has applied the rational basis test and upheld a legislative classification. [*Id.* at 565].

■ Here, it has been demonstrated that § 138 does not directly affect one's free speech since "[a] limitation on the amount of money a person may give to a candidate or campaign organization ... involves little direct restraint on his political communication." *Buckley*, 424 *U.S.* at 21, 96 *S.Ct.* at 635, 46 *L.Ed.*2d at 689. Since § 138 at most indirectly or insubstantially affects a fundamental right, the correct test under *Greenberg* is the rational basis test.

■ In addition, the character of the classification, *i.e.*, casino licensees, owners and managers, is not based on any "suspect" criterion. § 138 draws a distinction between persons based solely upon whether they serve as officers or high level employees of a casino. Thus, on this basis also, the classification in § 138 need only be rationally related to a legitimate interest.

■ The application of § 138's prohibition to casinos and their high level personnel is rationally related to the legitimate state interest in preventing political corruption, or the appearance of political corruption, on the part of the casino industry. However, even if § 138 were subject to the strict scrutiny test, it would be upheld under the three factors established by the United States Supreme Court in *Dunn v. Blumstein.*

■ The prohibition is also valid under the balancing test applied by the New Jersey Supreme Court under our State constitution. This test considers the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction. *Greenberg*, 99 *N.J.* at 567.

Gambling has a substantial impact upon the public welfare and morals. *See Knight v. Margate*, 86 *N.J.* at 392. It is so extraordinarily sensitive and of such basic interest to New Jersey and its citizens that it is governed directly by the State constitution, and specific forms of gambling are limited exceptions to the general prohibition. *O'Brien and Flaherty*, "Regulation of the Atlantic City Casino Industry and Attempts to Control its Infiltration by Organized Crime," 16 *Rutgers L.J.* 721, 722 (1985). The adoption of the constitutional amendment by referendum came only after the public was repeatedly assured that New Jersey would strongly regulate casinos, that organized crime would not be allowed to infiltrate the industry in any form, that operating controls would be stringent and that only those persons of highest character, integrity and competence would be allowed to participate in casino operations. *Id.* at 723. This stringent control is predicated on the concept that gambling is an activity which has been traditionally associated with criminality and misconduct. *Ibid.* Even when conducted in a legalized form, it attracts improper influence and is potentially harmful to the public. *Ibid.*

In conclusion, a limitation on the amount of contribution to a candidate for public office or any party or group organized to support such candidates involves little direct restraint on political contribution. *Buckley*, 424 *U.S.* at 21, 96 *S.Ct.* at 635, 46 *L.Ed.*2d at 689. Nevertheless, "[e]ven a 'significant interference' with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 *S.Ct.* at 637, 46 *L.Ed.*2d at 691.

Since it is acknowledged that gambling "is an activity rife with evil" to the extent that it is governed directly by the constitution of New Jersey, *Knight v. Margate*, 86 *N.J.* at 392, it is the "pronounced policy of this State to regulate and control the casino industry with the utmost strictness" in order to reinsure that "public confidence and trust in the honesty and

integrity of the State's regulatory machinery can be sustained." *Ibid.* In order to fulfill this obligation the legislative power to regulate such a " 'nonessential and inherently dangerous commodity', as a wholly constitutional expression of concern for public health, safety, morals or general welfare, has been said to be almost without limit." *Grand Union Co. v. Sills,* 43 *N.J.* 390, 403–404 (1964); accord, *In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* at 341.

We have noted that political parties are an integral part of the governmental process and imbued with quasi-governmental character, *See ante* at 319, and as such, their activities are controlled by the State. A political party, a local party organization or individuals who participate in policy making within a party organization may have influence or power which could be used to affect various actions concerning the casino industry. See *Schiller Park,* 63 *Ill.*2d at 512, 349 *N.E.*2d at 66.

 In conjunction with this, we have heretofore pointed out that the courts will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *See ante* at 321. Here, the legislature has reasonably believed that "to further the relative State interest would have been much less effective if only contributions above a certain amount were prohibited." *Schiller Park,* 63 *Ill.*2d at 509, 349 *N.E.*2d at 66. § 138 does not proscribe casino key employees from engaging in any type of "pure speech". For example, key casino employees may express their political opinions to anyone who will listen; they may announce their support for candidates or political parties; they can express their political opinions by exercising their voting rights. *Ibid.* Additionally, § 138 does not prohibit the licensees from joining political parties or groups or, in the present case, from volunteering non-professional services, to those parties or groups.

 *Buckley* approved the limitation on political contributions to the entire public at large throughout the United States

whereas § 138 applies to only a small percentage, approximately 3.5%, *see ante* at 325, of all the employees in the casino industry. Here, the prohibition under § 138 affects a relatively small percentage of persons in the casino industry who must accept the Act's imposition of restrictions and prohibitions as a condition of their employment. *Cf. Policemen's Benev. Ass'n. of N.J. v. Washington Tp.*, 850 *F.*2d 133, 135 (3d Cir.1988) (township's imposition of drug-testing as condition of police officers' employment did not violate Fourth Amendment); *Shoemaker v. Handel*, 795 *F.*2d 1136 (3d Cir.1986) (State-imposed compulsory drug-testing as condition of employment in the horse-racing industry did not violate Fourth Amendment). "[C]ertain amenities of life, and perhaps even some legal rights, have to be sacrificed or curtailed for the larger purpose of avoiding the fact" of, or appearance of impropriety. *In re Gaulkin*, 69 *N.J.* at 199. The threat of impropriety is "particularly insidious when the concern is that casinos, with their enormous economic power, might appear to infiltrate" the governmental process. *Greenberg*, 99 *N.J.* at 561.

Affirmed.